Filed 12/8/14

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FRIENDS OF THE KINGS RIVER,<br><br>   Plaintiff and Appellant,<br><br>      v.<br><br>COUNTY OF FRESNO et al.,<br><br>   Defendants and Respondents;<br><br>COLONY LAND COMPANY, L.P. et al.<br><br>   Real Parties in Interest and Respondents. | F068818<br><br>(Super. Ct. No. 12CECG03730)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Law Offices of Donald B. Mooney, Donald B. Mooney and Marsha A. Burch for Plaintiff and Appellant.

Daniel C. Cederborg, County Counsel, and Bruce B. Johnson, Deputy County Counsel for Defendants and Respondents County of Fresno and Fresno County Board of Supervisors.

Mitchell L. Chadwick, Patrick W. Mitchell, Andrew M. Skanchy for Real Parties in Interest and Respondents Colony Land Company, L.P. and Carmelita Resources, LLC.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication as to the Introduction, Facts and Procedural History, parts II. and IV.E. of the Discussion, and the Disposition.

## *INTRODUCTION*

This case involves the Carmelita Mine and Reclamation Project (the Project), a proposed aggregate mine and related processing plants to be operated on a 1,500-acre site at the base of the Sierra Nevada foothills near the towns of Sanger and Reedley. The Project includes, as required for every new surface mining operation, a reclamation plan that specifies how the land will be treated to provide a usable postmining site. Fresno County (County) prepared an environmental impact report (EIR) for the Project, and County's board of supervisors (the Board) certified the EIR.

An organization called Friends of the Kings River (petitioner or Friends) pursued an appeal of County's approval of the Project with the State Mining and Geology Board (the SMGB). The SMGB granted Friends' appeal and remanded the reclamation plan to County for reconsideration. County approved a revised reclamation plan, and Friends appealed to the SMGB again. In Friends' second appeal, the SMGB upheld County's decision to approve the Project.

While its first SMGB appeal was pending, Friends initiated the case before us by petitioning the trial court for writ of mandate. In its petition, Friends asserted a single cause of action alleging abuse of discretion under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).[1] The trial court denied the petition.

In this appeal, petitioner contends the trial court erred by ruling on the petition at a time when "[j]udicial review of the Project approval was not ripe" because the SMGB had granted its first appeal. Alternatively, petitioner contends County failed to proceed in a manner required by law by approving the EIR at a time when the reclamation plan was invalid.

Petitioner also raises numerous challenges to the adequacy of the EIR under CEQA. It argues the project description is inadequate, certain conclusions regarding

---

[1] Subsequent statutory references are to the Public Resources Code unless otherwise noted.

water issues lack substantial evidence, County should have required the acquisition of agricultural conservation easements as a mitigation measure for the loss of farmland resulting from the Project, the EIR's discussion of potential impacts to air quality, hydrology and noise are inadequate, and the final EIR contains significant new information and erroneous conclusions.  Finally, petitioner contends no substantial evidence supports the required findings for a conditional use permit.

We affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

### The Project

In June 2010, Colony Land Company, L.P. (the applicant), applied to the Fresno County Department of Public Works and Planning (the public works department) for a conditional use permit (CUP), site plan review/occupancy permit, and reclamation plan for an aggregate mine and related processing, asphalt, ready mix concrete, and recycling plants to be operated by Carmelita Resources, LLC.[2]  The applicant proposed an aggregate production rate of 1.25 million tons per year and an operating life of up to 100 years.

The proposed location for the Project is a 1,500-acre site south of State Route 180, east of the Kings River, west of Reed Avenue, and approximately 15 miles east of the city of Fresno.  The Project site is on a flat terrace of former river deposits and is currently used for growing row crops and stone fruit trees.  Large and small farms with grape, tree fruit, walnut, open pasture, and rural homesites surround the Project site.  Area-wide development includes rural farming, limited commercial and municipal facilities, and residential subdivisions associated with the towns of Sanger and Reedley.  In the vicinity, there are aggregate production operations to the northwest and southwest.

---

[2]      The applicant and Carmelita Resources, LLC, together are the real parties in interest in this case.

Another mining and reclamation project has been proposed to the northeast. Reedley Airport is southeast of the Project site.

In 1986, California classified the area as a Mineral Resource Zone 2, which means adequate information indicates that significant mineral deposits are present or there is a high likelihood for their presence. In 1988, California designated the Project site as having construction-grade aggregate deposits of regional significance.

The proposed aggregate production operation would eventually occupy 898 acres of the site. The remaining 602 acres would continue to support tree fruit production; 850 acres would be divided into 22 individual mining cells of approximately 40 acres. Each cell would be mined to a depth of 50 feet below ground surface with slopes of 2:1 (horizontal:vertical) (h:v). The average cell is estimated to contain approximately 2.69 million cubic yards of material, resulting in an approximate total of 100 million tons of marketable aggregate and 25 million tons of overburden and soils. Mining cell development would involve cell-by-cell mining and reclamation operations. According to the operational statement provided with the Project application, the operations would be typical of sand and gravel extraction, with conventional mining practices common to the industry. Soils and overburden would be removed and the underlying aggregate reserves would be excavated and transported to an on-site rock processing plant for washing and sizing. Materials would be sold as washed aggregates or used to make products including asphaltic concrete and Portland cement concrete at on-site plants. Access to the Project site would be from Reed Avenue.

The Project application included a reclamation plan intended to address the requirements of the Surface Mining and Reclamation Act of 1975 (§ 2710 et seq.; SMARA) and associated state regulations, as well as County's reclamation standards. The reclamation plan provided that all available overburden and soils would be used to recreate agricultural soils for continued production of tree crops. Remaining areas would be covered with water at varying elevations and would be used for irrigation and potential

future water storage for irrigation. It was anticipated that 25 percent of the mined areas would be reclaimed to agricultural land and the remaining mined areas would be agricultural water ponds (also referred to as pits or basins).

Subsequent revised versions of the reclamation plan were prepared in May 2012 and August 2012.

### Preparation and certification of the EIR, denial of Friends' administrative appeal

In August 2010, County issued a notice of preparation of a draft EIR (DEIR) for the Project. In October 2011, County made the DEIR available for public review and comment. A 45-day review and comment period began on October 7 and ended on November 21, 2011.

In May 2012, County circulated the final EIR (FEIR). The FEIR consisted of the DEIR, revisions and corrections to the DEIR, comments received on the DEIR, a list of persons, organizations and public agencies that commented on the DEIR, responses to the comments, and other information added by County.[3] In July 2012, County gave notice of a public hearing on the Project. On August 9, 2012, the County planning commission held a public hearing on the Project and passed a resolution certifying the FEIR. The planning commission found that certain significant environmental effects could not be mitigated to insignificant levels and adopted a statement of overriding considerations. The significant environmental effects related to the conversion of farmland, air pollutant emissions, odors, and traffic.

Friends appealed the planning commission's approval of the Project to the Board. On October 16, 2012, the Board considered and rejected petitioner's appeal. The Board

---

[3]     Because the FEIR includes all of the reports, revisions, and other information that constitute the EIR, the terms "FEIR" and "EIR" may be considered synonymous. Generally, we use the term FEIR when we are considering information added *after* the circulation of the DEIR, such as the responses to public comments and revisions to the DEIR, and we use the term EIR when we are discussing the document as a whole.

passed a resolution finding that the FEIR had been completed and processed in compliance with CEQA and certifying the FEIR. The Board adopted findings set forth in a 58-page document titled "CEQA FINDINGS OF FACT AND STATEMENT OF OVERRIDING CONSIDERATIONS," which was attached to the resolution, and found that the "MITIGATION MONITORING AND REPORTING PROGRAM" (MMRP) (also attached to the resolution and incorporated by reference) was "adequate with respect to those mitigation measures imposed on the project."

### *Friends' appeal to the State Mining and Geology Board*

On October 30, 2012, petitioner submitted a designation appeal[4] of the Board's decision to the SMGB, alleging that the reclamation plan was in conflict with various requirements of SMARA.

On March 14, 2013, the SMGB held a public hearing on the Project and granted petitioner's designation appeal. In a letter dated March 19, 2013, the SMGB's executive officer wrote, "[T]he SMGB granted the appeal, denied the County's approval of the reclamation plan on procedural grounds, and remanded the reclamation plan back to the County for approval consideration upon completion of the reclamation plan."[5]

---

[4] The SMGB and the parties refer to an appeal to the SMGB as a "designation appeal," and we will sometimes use the phrase as well.

[5] The appellate record also includes a staff report to the SMGB on the appeal. The report offered three suggested findings: (1) County did not have available water balance analysis or slope stability analysis to address the potential instability of the proposed 2:1 slopes of the proposed water basins at the time County approved the reclamation plan and CUP; (2) the Office of Mine Reclamation (OMR) previously informed County that the reclamation plan would not be deemed complete until three conditions were adequately addressed, County agreed to address the three conditions in the reclamation plan, but it later approved the reclamation plan without incorporating responses to the OMR-suggested conditions into the plan; and (3) "Due to uncertainties associated with the water balance calculations and related slope stability issues, as well as whether the proposed mined lands can be reclaimed to a useable [*sic*] condition which is readily adaptable for alternative land uses pursuant to … Section 2712[, subdivision ](a), and because the County may address those issues upon remand to allow it to complete its determination of the reclamation plan at issue, it is apparent that such remand is appropriate."

*County approval of revised reclamation plan, second appeal to the SMGB*

In response to the SMGB's decision remanding the reclamation plan, the Board reconsidered the reclamation plan for the Project at a public meeting on July 9, 2013. The public works department prepared an addendum to the FEIR. County staff member Augustine Ramirez told the Board that the reclamation plan had been revised to include an engineered grading and drainage plan and a postmining water balance.[6] Ramirez stated that the revisions did "not change the information analysis or conclusions of the EIR" that the Board already certified, and he recommended the Board approve the revised reclamation plan. On August 6, 2013, the Board passed a resolution in which it found that the revised reclamation plan "provides for a post-mining usable condition of the site, in compliance with SMARA" and approved the addendum to the FEIR and revised reclamation plan for the Project.

On August 9, 2013, Friends submitted a second designation appeal to the SMGB, appealing the Board's approval of the revised reclamation plan. On November 14, 2013, the SMGB held a public hearing on Friends' second appeal. The SMGB determined that County's decision was supported by substantial evidence and upheld County's decision to approve a permit and reclamation plan for the Project.

*Current writ petition*

On November 20, 2012, while its first SMGB designation appeal was pending, Friends filed a petition for writ of mandate against County and the Board (respondents) challenging the certification of the EIR. Petitioner alleged that the EIR "fails to adequately disclose, analyze and/or mitigate the Project's environmental impacts as required by law" and "its conclusions regarding the Project's environmental impacts are

These findings were not included in the SMGB's letter of March 19, 2013, and nothing in the appellate record indicates whether these findings were adopted by the SMGB.

[6]    The revised reclamation plan and addendum to the FEIR are not in the administrative record and are not part of the record on appeal.

7.

not supported by substantial evidence." Petitioner alleged respondents violated CEQA by approving the Project because it conflicts with County's general plan.

Petitioner further alleged that the reclamation plan for the Project did not meet the requirements of SMARA and that it had submitted a designation appeal to the SMGB. Petitioner further alleged it "will amend this Petition to include allegations of SMARA violation in the event the appeal is denied."

After the SMGB granted its first designation appeal, Friends argued to the trial court that the SMGB's decision "invalidated" the reclamation plan for the Project and as result, "there is no valid Project approval to be considered by this Court." Respondents and the real parties in interest took the position that the SMGB's decision was irrelevant to the issue whether County abused its discretion in certifying the EIR.[7]

On August 23, 2013, the trial court held a hearing on the petition and took the matter under submission. (The record on appeal does not include a transcript of the hearing.) On November 14, 2013, the trial court issued an order denying the petition for writ of mandate.

Friends filed a notice of appeal on January 10, 2014.

### Subsequent writ petition

On August 21, 2013, Friends filed a second petition for writ of mandate against respondents, in which it challenged the Board's decision of August 8, 2013, approving the revised reclamation plan for the Project.

---

[7] The trial court was kept informed of the progress of the designation appeals. In April 2013, Friends filed a request for judicial notice, asking the trial court to take judicial notice of documents related to the SMGB's decision in its first designation appeal. Although respondents and the real parties in interest opposed this request, after the Board approved the revised reclamation plan in August 2013, they joined petitioner's request that the trial court take judicial notice of the Board's resolution and meeting transcript. Petitioner later informed the court that it was filing a second SMGB appeal. Subsequently, the parties filed another joint request for judicial notice after the SMGB upheld the County's approval of the revised reclamation plan.

## *DISCUSSION*

### I.    *The trial court did not err by ruling on the writ petition*[*]

Petitioner's first contention is that the trial court erred by reviewing the adequacy of the EIR at a time when the reclamation plan "had been nullified by the SMGB."  It argues that "[j]udicial review of the Project approval was not ripe" because the reclamation plan, which was "an essential element of the CUP," had been "set aside and was of no effect."

Respondents and the real parties in interest respond that petitioner's CEQA cause of action was ripe when petitioner filed the petition and evidence of the SMGB appeal was inappropriate extra-record evidence that had no impact on the justiciability of the petition.[8]  We conclude the trial court did not err by deciding Friends' writ petition.

Ripeness is a question of law that we review de novo on appeal.  (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582 (*Wilson & Wilson*) see *Steinberg v. Chiang* (2014) 223 Cal.App.4th 338, 343 [whether probable future dispute over legal rights between parties is sufficiently ripe to be an actual controversy for which declaratory relief is available is question of law].)

"[A] basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy."  (*Pacific Legal Foundation v. California Coastal Com*. (1982) 33 Cal.3d 158, 169 (*Pacific Legal*).)  "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions.  [Citation.]  It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion.…  [T]he ripeness doctrine is

---

[*]    See footnote, *ante*, page 1.

[8]    They also note that lack of a ripe controversy is usually raised by a defendant trying to defeat a lawsuit, not by the party who initiates the lawsuit, since a plaintiff or petitioner may simply dismiss the lawsuit voluntarily if he or she realizes the controversy is not ripe.  (Code Civ. Proc., § 581, subds. (b)(1), (c).)

primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Id*. at p. 170.) "'The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.'" (*Id*. at pp. 170-171, quoting *Aetna Life Ins. Co. v. Haworth* (1937) 300 U.S. 227, 240-241.)

Here, Friends challenged the certification of the EIR and the approval of the Project. This is a real and substantial controversy, not a hypothetical situation. In the petition's prayer for relief, Friends sought, among other things, a "peremptory writ of mandate directing Respondents to vacate and set aside the certification of the EIR prepared for the Project on the ground that it violates [CEQA]." This is "'specific relief through a decree of a conclusive character,'" not an advisory legal opinion. (*Pacific Legal*, *supra*, 33 Cal.3d at p. 171.) Thus, a ripe controversy existed at the time petitioner filed its petition.

Respondents and real parties in interest point out that a dispute that is ripe at the inception of a lawsuit cannot become unripe based on subsequent events, although it may become moot. "'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.] But 'ripeness is not a static state' [citation], and a case that presents a true controversy at its inception becomes moot "'if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character."' [Citation.]" (*Wilson & Wilson*, *supra*, 191 Cal.App.4th at p. 1573.) Petitioner replies that "issues surrounding the validity of the approval(s) and the sufficiency of the environmental review were either moot or unripe with respect to the

10.

invalidated Reclamation Plan." We conclude the case was neither unripe nor moot. "The pivotal question in determining if a case is moot is … whether the court can grant the plaintiff any effectual relief." (*Id*. at p. 1574.) In this case, the trial court could have granted petitioner effectual relief. Had the court found in petitioner's favor, it could have set aside the certification of the EIR. Accordingly, the lawsuit was not moot at the time the trial court ruled.

At this point, we observe that Friends' position is somewhat curious. If it is correct that the issues raised in its writ petition were moot at the time the trial court ruled, then the appropriate result would have been dismissal of its lawsuit. (*Wilson & Wilson*, *supra*, 191 Cal.App.4th at p. 1574 ["When events render a case moot, the court, whether trial or appellate should generally dismiss it."].) Likewise, if its CEQA cause of action was not ripe, the trial court should have denied relief. (*Wilson & Wilson*, *supra*, at p. 1575; see *Pacific Legal*, *supra*, 33 Cal.3d at pp. 163, 174.)

On appeal, petitioner does not suggest the trial court should have *dismissed* the writ petition because it was unripe or moot. Instead, it asserts that the trial court's review of the EIR should not have occurred until *after* the revised reclamation plan was adopted. Petitioner, however, does not claim that a completed SMGB appeal process was an administrative prerequisite to the trial court's review of the EIR for compliance with CEQA.[9] To the extent petitioner argues that the trial court was required to abstain from considering its CEQA lawsuit while petitioner pursued separate SMARA claims with the SMGB, petitioner offers no authority for this proposition, and we reject it.

At trial, Friends did not claim that the court should stay or continue the case until the SMGB appeal process was concluded. In its opening brief to the trial court, Friends

---

[9] To the contrary, in the writ petition Friends alleged it "performed any and all conditions precedent to filing the instant action and … exhausted any and all available administrative remedies to the extent required by law."

11.

told the court about its successful first appeal to the SMGB and argued that, since the reclamation plan had been "set aside" by the SMGB, the trial court should also set aside the CUP approval. It appears that Friends' position is not that the trial court had *no authority* to rule on its writ petition but, rather, that the trial court was *required* to find that County's approval of the reclamation plan for the Project had been invalidated by the SMGB's action and this, in turn, rendered the EIR inadequate. On appeal, petitioner continues to assert that the reclamation plan was "nullified," "invalidated," and "set aside" by the SMGB. Accordingly, we consider what effect, if any, the SMGB's decision on Friends' first designation appeal had on County's approval of the reclamation plan and certification of the EIR.

## II.    The successful SMGB appeal did not set aside County's approval of the reclamation plan or nullify the certification of the EIR

### A.    Statutory framework of SMARA

"SMARA was enacted by the Legislature in recognition that 'the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety.' (§ 2711, subd. (a).)" (*Mineral Associations Coalition v. State Mining & Geology Bd*. (2006) 138 Cal.App.4th 574, 580.)

"A reclamation plan under SMARA is a written plan specifying how mined land will be treated so as to minimize the environmental impacts of mining and render a mined site usable in the future for alternative purposes. (See § 2733.) Financial assurances are a mine operator's pledges of funds sufficient to perform reclamation in accordance with an approved reclamation plan. (§ 2773.1, subd. (a)(1)." (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 981 (*El Dorado County*).) "'At the heart of SMARA is the requirement that every surface mining operation have a

12.

permit, a reclamation plan, and financial assurances. (§ 2770, subd. (a).)'" (*Id*. at p. 984.)

SMARA provides for ""'"home rule,"'" with the local lead agency (in this case, County) having primary responsibility for enforcing the law's requirements. (*El Dorado County*, *supra*, 36 Cal.4th at p. 984; §§ 2728, 2774.1, subd. (f).) "'Prior to approving reclamation plans and financial assurances, the lead agency submits the proposals and all supporting documentation, including information from any document prepared, adopted or certified pursuant to CEQA, to the Director [of the Department of Conservation] for review. (§ 2774, subd. (c).) The Director then may prepare written comments, if he chooses, within 30 days for reclamation plans and 45 days for financial assurances. (§ 2774, subd. (d)(1).) The lead agency shall prepare written responses to the Director's comments, describing disposition of the major issues raised. In particular, the lead agency shall explain in detail why any specific comments and suggestions were not accepted. (§ 2774, subd. (d)(2).) Thus, although the lead agency must evaluate and respond to the Director's comments, it need not always accept them.'" (*El Dorado County*, *supra*, at pp. 984-985.)

The SMGB is authorized to hear appeals by "any person who is aggrieved by the granting of a permit to conduct surface mining operations in an area of statewide or regional significance." (§ 2775, subd. (a).) In deciding a designation appeal, the SMGB "shall not exercise its independent judgment on the evidence but shall only determine whether the decision of the lead agency is supported by substantial evidence in the light of the whole record." (*Id.*, subd. (c).) If the SMGB determines that a lead agency's decision is not supported by substantial evidence, the SMGB "shall remand the appeal to the lead agency and the lead agency shall schedule a public hearing to reconsider its action." (*Ibid.*)

13.

In addition, the SMGB has authority to step in and take over as the lead agency if it finds that the local lead agency has failed to meet its enforcement obligations under SMARA. (*El Dorado County*, *supra*, 36 Cal.4th at pp. 985-986; § 2774.4.)[10]

### B.     Analysis

The SMGB wrote that it "granted [petitioner's] appeal, denied the County's approval of the reclamation plan on procedural grounds, and remanded the reclamation plan back to the County for approval consideration upon completion of the reclamation plan." The SMGB did not make a determination that the reclamation plan for the Project was not supported by substantial evidence but found that it was not complete for SMARA purposes.

Respondents and real parties in interest argue that a remand by the SMGB "has no impact on the validity of an approved reclamation plan, but merely informs the lead agency about the SMGB's position and requires the lead agency to consider the plan again in light of the SMGB's concerns." For the reasons explained below, we agree.

"[A]dministrative agencies have only such powers as have been conferred on them, expressly or by implication, by constitution or statute." (*Ferdig v. State Personnel Bd*. (1969) 71 Cal.2d 96, 103.) "'[A]n agency literally has *no power to act* … unless and until [the Legislature] confers power upon it.' [Citation.]" (*Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 419.) "That an agency has

---

**10**     "'Where the lead agency fails to fulfill its duties under SMARA, the [SMGB] may take over the powers of a lead agency, except for permitting authority. The [SMGB] may step in if it finds that a lead agency has: (1) approved reclamation plans and financial assurances that are not consistent with SMARA; (2) failed to inspect mines as required by SMARA; (3) failed to seek forfeiture of financial assurances to carry out reclamation; (4) failed to take appropriate enforcement actions; (5) intentionally misrepresented the results of inspections; or (6) failed to submit the required information to the Department [of Conservation]. (§ 2774, subd. (a).)'" (*El Dorado County*, *supra*, 36 Cal.4th at p. 985.)

been granted *some* authority to act within a given area does not mean that it enjoys *plenary* authority to act in that area." (*Ibid.*)

In this case, the agency at issue, the SMGB, has not been granted authority to set aside or nullify a lead agency's approval of a project or a reclamation plan. The only remedy available for a successful appeal to the SMGB is remand to the lead agency for reconsideration. (§ 2775, subd. (c).) When the SMGB determines that a lead agency's decision is not supported by substantial evidence, the lead agency must hold a public hearing and reconsider its action, but section 2775 does not require the lead agency to set aside its prior decision. Although the SMGB wrote that it "denied the County's approval of the reclamation plan," the SMGB had no power to deny the approval of the reclamation plan. It is the local lead agency that is responsible for approving reclamation plans. (§ 2728.) This does not mean the SMGB is powerless to enforce SMARA. As we have described, the SMGB may step in and take over as the lead agency if it finds the local lead agency is not enforcing SMARA adequately.[11] (*El Dorado County*, *supra*, 36 Cal.4th at pp. 985-986.) That has not happened in this case, however, and County is the lead agency for SMARA and CEQA purposes. (§§ 2728, 21067; see *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 268-269 [county in which proposed surface mining operation was located was lead agency under SMARA and CEQA].)

In support of its assertion that the SMGB's remand rendered the reclamation plan "set aside" and "of no effect," petitioner cites *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931 (*County of Amador*). Petitioner's reliance on *County of Amador* is misplaced.

---

[11] In addition, where a local lead agency approves an allegedly inadequate reclamation plan, the Director of the Department of Conservation may petition for writ of mandate to seek judicial review of the local lead agency's approval of the plan. (*El Dorado County*, *supra*, 36 Cal.4th at pp. 992-994.)

15.

In *County of Amador*, a water agency and an irrigation district certified an EIR for a water project. After the trial court issued a writ of mandate setting aside the approval of the EIR, the agencies appealed, arguing that subsequent action by the State Water Resources Control Board (SWRCB) mooted the trial court's concerns. (*County of Amador*, *supra*, 76 Cal.App.4th at pp. 940-941.) The trial court had ruled that the EIR did not adequately assess the project's impacts on fishery resources and lake levels. On appeal, the agencies asserted the SWRCB later provided the requisite analysis and mitigation measures by imposing conditions in its own decision, D-1635. The SWRCB, however, subsequently ordered reconsideration of D-1635. The Court of Appeal rejected the agencies' claim that D-1635 could be relied upon to remedy deficiencies in the EIR. In doing so, the court observed, "Because reconsideration has been granted, D-1635 is of no effect. It therefore cannot be deemed to 'moot' anything." (*Id*. at p. 949.) *County of Amador* does not support the proposition that the SMGB's remand had the effect of setting aside the reclamation plan or nullifying County's certification of the EIR in this case. *County of Amador* did not concern the issue whether the SMGB has the authority to set aside another agency's approval decision, and a case is not authority for points not decided or considered. (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155.) Furthermore, the agency in *County of Amador*, the SWRCB, was reconsidering *its own decision* and it had the authority to reverse itself. (See Wat. Code, § 1123.) Here, in contrast, the SMGB reviewed and remanded County's decision, and as we have discussed, the SMGB has no statutory authority to set aside a local lead agency's approval of a reclamation plan.

In summary, the SMGB did not have authority to set aside County's approval of the reclamation plan for the Project. As a consequence, its decision granting Friends' first designation appeal had no effect on County's certification of the EIR and approval of the Project.

This means that Friends' arguments premised on the theory that the SMGB set aside or invalidated County's approval of the reclamation plan are also unavailing. Petitioner contends County failed to proceed in a manner required by law because it failed to comply with a County ordinance that requires there be a reclamation plan in order to approve a CUP application for a surface mining operation. Petitioner asserts: "The CUP approval was no longer valid as a result of the SMGB remand of the Reclamation Plan because the necessary findings could not be made at the time of Project approval. At the time the trial court reviewed the 'Project' and its associated EIR, there was no valid Reclamation Plan in place." Because the SMGB did not set aside or invalidate the reclamation plan approved by County, this argument fails.

Having concluded that the SMGB's first designation appeal decision did not render Friends' petition unripe or moot and did not invalidate County's approval of the reclamation plan, we agree with respondents and real parties in interest that evidence of the SMGB proceedings—which occurred after County certified the EIR—is not admissible in our consideration of CEQA issues. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576 ["extra-record evidence is generally not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions on the ground that the agency 'has not proceeded in a manner required by law' within the meaning of … section 21168.5"].)

III.    *Friends may not raise a SMARA claim for the first time on appeal*[*]

Petitioner next contends that County failed to proceed in a manner required by law because County improperly avoided SMARA requirements. Specifically, it argues that the reclamation plan approved by County in October 2012 lacks (1) an engineered grading and drainage plan and (2) a postmining calculated water balance. Friends,

---

[*]    See footnote, *ante*, page 1.

17.

however, did not assert a cause of action for alleged violations of SMARA in its writ petition. Petitioner did refer to SMARA and its pending designation appeal, alleging: "The Reclamation Plan is inconsistent with the requirements of SMARA. Friends has appealed the Reclamation Plan approval to the State Mining and Geology Board under … section 2775, and will amend this Petition to include allegations of SMARA violation in the event the appeal is denied." Thus, petitioner pointedly did not seek relief from the trial court for alleged violations of SMARA. Although petitioner indicated it might later amend its pleadings to add a cause of action under SMARA, nothing in the record suggests it ever did so.

To the extent petitioner now asks this court to reverse the trial court's judgment based on alleged violations of SMARA distinct from any alleged violation of CEQA, it may not raise this new claim for the first time on appeal. (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1325 ["""A party is not permitted to change his position and adopt a new and different theory on appeal."""].)

On the other hand, Friends' contention that the reclamation plan is incomplete and resulted in an inadequate CEQA analysis is properly before us. The reclamation plan is part of the Project as a whole and is reviewable together with the rest of the EIR for compliance with CEQA. (See *Nelson v. County of Kern*, *supra*, 190 Cal.App.4th at p. 272 [for proposed surface mining operation, "project" for CEQA purposes included both mining operations and reclamation plan].) As will be seen, petitioner relies on the argument that the reclamation plan is missing essential elements to support various challenges to the adequacy of the EIR, and we address this argument in our discussion of CEQA issues.

## IV. *Friends' challenges to the Project under CEQA*[*]

Petitioner contends the EIR for the Project fails to comply with CEQA for several reasons. It argues the project description is inadequate; there is no support for the conclusion the Project will not impact groundwater supplies and adjacent riparian vegetation; mitigation is required for the conversion of farmland; the analyses of air quality, hydrology, and noise are inadequate; and the FEIR contains significant new information and erroneous conclusions.

We begin our discussion with a brief overview of CEQA.

### A. *CEQA*[*]

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project[12] that may have a significant effect on the environment. [Citations.] … '"Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citations.] The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-391, fns. omitted (*Laurel Heights I*).)

"An adequate EIR must be 'prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which

---

[*]     See footnote, *ante*, page 1.

[*]     See footnote, *ante*, page 1.

[12]    The parties do not dispute that the Project qualifies as a "project" for CEQA purposes.

19.

intelligently takes account of environmental consequences.' (Guidelines, § 15151.)[13] It 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.]" (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 (*Dry Creek*).) "CEQA requires an EIR to reflect a good faith effort at full disclosure[, but] it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Ibid*.)

### B. *Standard of review*[*]

"Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise. [Citations.]" (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.) In considering Friends' CEQA arguments, we independently review the administrative record to determine whether County prejudicially abused its discretion. (§ 21168.5; *Dry Creek*, *supra*, 70 Cal.App.4th at p. 25; *Nelson v. County of Kern*, *supra*, 190 Cal.App.4th at p. 266.)

"Abuse of discretion is established [1] if the agency has not proceeded in a manner required by law or [2] if the determination is not supported by substantial evidence. The court does not pass on the correctness of an EIR's environmental conclusions, but determines whether the EIR is sufficient as an informational document." (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 26.) Substantial evidence is defined in the CEQA Guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might

---

**13** "Guidelines" and "CEQA Guidelines" refer to the CEQA regulations codified at title 14 of the California Code of Regulations section 15000 et seq. We cite to these regulations as Guidelines.

* See footnote, *ante*, page 1.

20.

also be reached." (Guidelines, § 15384, subd. (a).) Substantial evidence includes facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts, but not argument, speculation, unsubstantiated opinion or narrative, or evidence which is clearly erroneous or inaccurate. (*Id.*, subds. (a), (b).) "The information in an EIR may constitute substantial evidence in the record to support the agency's action on the project if its decision is later challenged in court." (Guidelines, § 15121, subd. (c).)

## C.  *Project description**

The project description in an EIR must contain specific information, including the precise location of the proposed project, a statement of objectives sought by the proposed project, and "[a] general description of the project's technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities." (Guidelines, § 15124, subds. (a)-(c).) The project description "should not supply extensive detail beyond that needed for evaluation and review of the environmental impact." (Guidelines, § 15124.)

"An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.) By the same token, "[a] curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*Id.* at p. 198.)

Petitioner contends that the project description in this case is incomplete, inaccurate, and unstable. It asserts that the project description is misleading about the potential for limitless nighttime operations. Petitioner also argues County's failure to require a sufficient reclamation plan resulted in an inadequate description of the Project.

### 1.  *Nighttime operations*

Petitioner argues the EIR contains "vague, misleading reference to nighttime operations that could, under the existing Project description, happen without limitation,"

---

\*       See footnote, *ante*, page 1.

21.

and this "violates CEQA's requirement that the Project description be clear and comprehensive enough to allow accurate analysis of impacts and meaningful public review."

In support of its argument, petitioner cites (1) certain language in the DEIR, (2) portions of the transcript of the Board's meeting of October 16, 2012, during which the Board considered Friends' administrative appeal of the planning commission's approval of the Project, and (3) an attorney's response to a comment by Friends on the FEIR. We consider the citations to the record offered by petitioner as well as additional references to nighttime operations in the EIR cited by respondents and real parties in interest.

### a. *Project description and additional references to nighttime operations in the DEIR and FEIR*

The project description is set forth in section 3.0 of the DEIR. It includes descriptions of the regional and local setting, site characteristics, current operations by the applicant, project objectives, proposed mining operations, and the reclamation plan. Subsection 3.4.3 describes the proposed mine operations. The anticipated maximum production of marketed aggregate is 1.25 million tons per year. Mining activity is to occur incrementally, taking "many decades (80 to 100 years) to complete."

Subsection 3.4.3.2, titled "Hours of Operation," provides:

> "Operations are planned to occur up to 6 days/week, or 312 days/year at maximum production. Operations will take place on weekdays and Saturdays, typically during the hours shown in Table 3-2. Although these hours represent typical hours of operation, *the Applicant is requesting approval to load material into trucks at night to support nighttime road construction projects (e.g., Caltrans highway jobs) and emergency work.* Maintenance activities (e.g. nightly equipment maintenance) will also extend beyond the hours shown." (Italics added.)

Table 3-2 in the DEIR shows that excavation and aggregate processing and production would occur 7:00 a.m. to 7:00 p.m. on weekdays; loading and aggregate trucking would occur 6:00 a.m. to 9:00 p.m. on weekdays; and asphalt and ready-mix

22.

concrete plants would begin operations on weekdays at 4:00 a.m., May through October, and at 5:30 a.m., November through April, and end at 6:00 p.m. and would operate on Saturdays 7:00 a.m. to 2:00 p.m.

Three footnotes to Table 3-2 reiterate the point that certain operations may occur at other times: (1) "Maintenance of mobile and plant equipment extends beyond these hours." (2) "During periods of public emergency affecting the health and safety of the community, continuous 24-hour daily operations may be required." (3) As to loading and aggregate trucking, "Major projects may be required to be completed during night hours or on weekends to avoid traffic conflicts. Such projects may require processing and loading operations beyond the hours shown."

The environmental impact evaluation of the Project is found in section 4 of the DEIR. Here, the DEIR addresses the potential environmental impacts of nighttime operation of the Project. In the noise analysis, the DEIR considers operational noise and includes analysis "for [nighttime] hours in cases where emergencies or night-paving projects require operation of various project components during those hours." It provides a noise exposure assessment table showing noise levels at identified noise receiver locations that would result from various operational activities (aggregate, recycle, asphalt, concrete, excavation) during daytime and nighttime. The DEIR notes that the increase in noise level from excavation activities could potentially be significant. The DEIR recommends mitigation measures to reduce the Project's noise impacts. Recommended Mitigation Measure N-2 provides, among other things, (1) excavation would only occur from 7:00 a.m. to 7:00 p.m. Monday through Friday unless it could be demonstrated through on-site noise measurements that such activities could occur during nighttime hours without exceeding the thresholds of significance, (2) rock plant processing and aggregate load-out would be limited to daytime hours "except during emergencies or to supply nighttime road construction projects and emergency work with nighttime delivery of materials," and (3) asphalt and ready-mix concrete plant operations

23.

would be limited to daytime hours "except during emergencies or nighttime road construction projects requiring materials." The DEIR concludes that the noise impacts of the Project would be less than significant with the implementation of the recommended mitigation measures.

In the visual or aesthetics analysis, the DEIR considers the potential effects of nighttime lighting for the Project. It recommends a mitigation measure regarding lighting and concludes that impacts from light and glare would be less than significant with implementation of the recommended mitigation measure.

After the DEIR was circulated for public review and comment, County received a comment letter on the DEIR from Christine Bienvenue and family. Bienvenue wrote: "Noise is another serious problem. The DEIR states that this mining operation may run for 24 hours a day in the event of an emergency but doesn't state what constitutes an emergency[.]" The FEIR provides this response:

> "As noted in footnote 2 of Draft EIR Table 3-2 (page 3-23), 'during periods of public emergency affecting the health and safety of the community, continuous 24-hour daily operations may be required.' Such emergency situations could include emergency road repairs or other infrastructure repairs necessary as [a] result of unanticipated conditions (e.g., bridge replacement due to flood damage, etc.). All potential emergency conditions cannot be and need not be defined for the purposes of the Project environmental review."

### b. Board meeting discussion of operations

On October 16, 2012, the Board considered Friends' appeal of the planning commission's approval of the Project. Will Kettler from the public works department spoke at the meeting. Regarding hours of operation, Kettler told the Board that the Project complied with County's noise ordinance and the plant was located in the center of the site, at the farthest point from any sensitive noise receptor. Board supervisor Debbie Poochigian asked how the operation hours compared to similar mining operations nearby. Kettler stated that he thought the hours were comparable and noted, "As with most

projects also, there's a 24-hour provision in case there's a public emergency where health and safety is an issue and the material is needed for that, they'd be authorized, and that is included in the operation statement as well."

Steve Lilburn, from Lilburn Corporation, which prepared the EIR for the Project, also addressed the Board. He stated:

> "These are their operating hours. Typical hours are shown. In some cases, the operations could occur outside of these hours, and the EIR addressed the potential for 24-hour operation in the analysis. This would occur under emergency circumstances. There are typically requirements by Caltrans that they operate off that there may be an emergency that requires immediate operations and supply material. The other thing that may occur, I suppose, in the past the energy off peak demands, we've had the Energy Commission actually ask operators occasionally to intentionally process in the evening when we have severe energy demands. But we've addressed the 24 hours throughout the documentation as a worst case scenario."

Poochigian asked: "So are you saying with energy demands, you would consider that an emergency to be able to go 24 hours?" Lilburn responded: "Actually, in the past I've seen the California Energy Commission stipulate aggregate producers that they run off peak in the evening, yes. It depends. It's usually in circumstances where they dictate that—they're looking at brown-outs and gray-outs and concerns about off peak energy, so they make the industrial users move off peak. That would be a typical example."

Board supervisor Susan Anderson asked what agencies, in addition to Caltrans and County, could declare an emergency. Lilburn did not identify any agencies but stated that an emergency situation would be when there are "massive needs for aggregates … following earthquake[s], flooding."

Anderson observed: "[S]ome of the residents who live around the area are concerned that that's not defined in the documents what an emergency is. I mean, who actually determines whether something is an emergency, because not every emergency will warrant afterhours working, but who determines when the plant can operate after hours because there's an emergency?" Lilburn stated: "Yeah, I don't know that it would

25.

be actually directed by the emergency, which is why we took the approach of analyzing it on a 24-hour aspect so that we were clear in assessing the potential impacts if it was 24 hours. Actual emergency would probably be a federal or state or local emergency as declared by the lead agency."

Anderson asked for Kettler's input on the issue. Kettler stated: "I think in the last several years there's been a couple instances where there were rockslides … where material was needed to open roads .… Maybe a couple times over the last few years, and the occurrence lasted maybe one to two days and it was during heavy storms .… [¶] … [¶] In those cases I believe it was Caltrans that needed the material. It was a state agency."

Anderson clarified, "So a government agency has to determine there's an emergency and that this particular plant is supplying that emergency and authorizes afterhour work, right?" Kettler responded, "Correct."

Petitioner also cites statements made by its own representative at the Board meeting. Friends' attorney, Marsha Burch , addressed the Board regarding nighttime operations as follows:

> "The EIR specifically states that it's not just for emergencies, it also includes nighttime operations; i.e., Caltrans highway projects. That's not an emergency. The Draft EIR and what has been reviewed is unlimited nighttime operations. [¶] Now, I understand that that's not going to happen, it's not going to be every night of the week for the entire year, but the way that the EIR is drafted and the way the permit will be drafted, it allows for nighttime operations that are not emergencies, and we all know that Caltrans operates at night a lot, and they have their reasons for doing that. But I think it's really misleading to say that only in emergencies are they going to be operating at night, because the way that it's drafted now that is not the case."

### c. *Attorney response letter*

Burch wrote a letter to County on behalf of petitioner dated August 3, 2012, in which she identified a variety of reasons she believed the FEIR was not in compliance

with CEQA. Burch argued that the project description was inadequate because, among other things, it would allow unlimited nighttime operations. She asserted that comments to the DEIR noted that the project description was misleading regarding nighttime operations and the FEIR's response did not address the fact that there were no limits on nighttime operations.

Attorney Thomas Henry, an attorney for the applicant, prepared a response to Burch's letter. In a letter, dated October 15, 2012, Henry wrote:

> "The commenter points to one of many references in the EIR to the potential for nighttime Project activities. Contrary to the commenter's assertion, the EIR adequately analyzes nighttime activities and imposes mitigation measures that mitigate all nighttime-specific impacts to a less than significant level. As noted by the commenter, Project hours are limited, but activities may occur during nighttime hours if there is an emergency or a paving project that requires material and cannot be serviced during the daytime hours. The frequency of emergencies and nighttime paving projects is uncertain, but the mitigation measures in place will reduce their impacts to a less than significant level when these activities do occur. A valid project description must, as here, be detailed enough to allow the decision maker to ascertain the project's effects and propose ways of mitigating them. (*See* DEIR Section 4.11-24 for a nighttime noise assessment, Mitigation Measures N-1 and N-2 reducing Project noise to a less than significant level, DEIR Section 4.1-21 for an analysis of nighttime lighting, and Mitigation Measure AES-3 mitigating nighttime lighting to a less than significant level."

### d. Analysis

We are not persuaded by Friends' argument that the project description is vague and misleading regarding nighttime operations. The EIR describes the usual operating hours of the Project and clearly states that there could be times when the Project would operate at night. Continuous 24-hour operations could occur in two situations: (1) during periods of public emergency and (2) when major projects requiring aggregate operate at night or on weekends to avoid traffic conflicts.

The EIR is not misleading or inconsistent about the possibility of nighttime operations. The project description, under the heading, "Hours of Operation," explains that the Project could operate continuously during periods of public emergency or when major projects, such as Caltrans highway construction, required it. The same information is repeated in the EIR's analyses of potential visual and noise impacts. The fact that the EIR addresses the potential environmental impacts of nighttime operations also refutes petitioner's argument that the project description is not "clear and comprehensive enough to allow accurate analysis of impacts and meaningful public review." Further, Bienvenue's comment and the Board's discussion on what could constitute an emergency show that the public decisionmakers were aware that the Project could operate at night and were not misled by the project description into believing the Project would operate only during the day. Nor does the EIR suggest that nighttime operations would occur only during emergencies, as argued by Burch. Under "Hours of Operation," the project description expressly provides, "the Applicant is requesting approval to load material into trucks at night *to support nighttime road construction projects (e.g., Caltrans highway jobs)* and emergency work." (Italics added.) Similarly, in the discussion of noise impacts, the EIR includes analysis of nighttime operations for times when "emergencies or *night-paving projects* require operation of various project components during those hours." (Italics added.)

We also reject petitioner's assertion that nighttime operations of the Project are unlimited. The EIR recommends Mitigation Measure N-2, which limits operations to daytime hours except during emergencies and nighttime construction projections. County accepted the recommendation and Mitigation Measure N-2 is included in the MMRP approved by the Board. Thus, nighttime operations are not unlimited; they are limited to circumstances described in the mitigation measure. Nonexcavation activities are limited to daytime except during emergencies and nighttime construction. Excavation activities are limited to daytime unless it can be shown through on-site noise

28.

measurements that such activities do not create noise exceeding the thresholds of significance. In addition, the Project is limited to a maximum aggregate production rate of 1.25 million tons per year.

### 2. Postmining condition of the site

Petitioner next argues that the project description is inadequate because the reclamation plan is missing "essential pieces of information regarding the post-mining condition of the site." Petitioner asserts the reclamation plan approved by the Board is flawed because it omits two elements: (1) an engineered grading and drainage plan and (2) a postmining calculated water balance.[14]

Given that petitioner's challenge is to the project description, we consider the information provided in the project description found in section 3 of the DEIR.

### a. Description of reclamation plan in the DEIR

Subsection 3.4.5, "Reclamation Plan," describes the postmining condition of the Project site: "The reclamation plan implementation results in a total reclaimed area of ±898 acres of which 104 acres of mine cell are backfilled with aggregate fines, 134 acres are backfilled with overburden backfill, 583 acres remain as water basins and are not backfilled, and 77 acres of existing roads will remain for post-mining access to the Project Site."

Subsection 3.4.5.2, titled "Backfilling, Regrading, Slope Stability and Recontouring ([Cal. Code Regs., tit. 14, § 3704])," provides:

> "The post-mining land use is water recharge and agriculture. Backfilling of the cell floor will commence once final design depth of a cell is reached using available overburden and unmarketable material/fines from processing operations. These materials will be used to elevate the quarry floor to final reclamation design depth. Approximately 25 percent of the Project Site is expected to be backfilled given the estimated fines and

---

[14] This argument echoes petitioner's argument that County failed to proceed in a manner required by law by improperly avoiding SMARA requirements.

29.

overburden amounts while 75 percent of mined cells will remain as water basins."[15]

Under the heading, "Cut Slope Stability ([Cal. Code Regs., tit. 14, § 3704, subd. (f)])," subsection 3.4.5.2 continues, "The Proposed Project, as designed, anticipates final reclaimed cut slopes of 2:1 (h:v)."

Subsection 3.4.5.4, "Drainage, Diversion Structures, Waterways, and Erosion Control ([Cal. Code Regs., tit. 14, § 3706])," provides:

> "The dominant beneficial use of water on-site and in the surrounding area is agriculture. As described, excavation operations will be phased. Agricultural uses will continue to occur in undisturbed phases and in phases where mining has reached design depth and reclamation backfilling actions have been completed. Reclaimed slopes will be 2:1 (h:v), and all stormwater will be maintained within active or reclaimed excavation areas. Therefore, no waters would leave the site impacting downstream beneficial uses."

---

[15] We note that this paragraph is revised in the FEIR. The FEIR explains: "Th[is] section is revised to clarify and amplify the methods for backfilling mined areas and to provide more specific information regarding the areas to be backfilled and soil placement in these areas. The revisions are consistent with the Project as evaluated in the Draft EIR." In the FEIR, the paragraph quoted above is replaced with the following:

"The post-mining land use is land and water basins for agriculture. Approximately 27 percent of the mine disturbance area would be backfilled using the fines and overburden, while approximately 65 percent would not be backfilled and would be reclaimed as water basins. The remaining 8 percent of the mine area is associated with access roads and setbacks. Of the areas to be reclaimed to land, the Reclamation Plan estimates that approximately 137 acres would be backfilled with overburden and approximately 102 acres would be backfilled with process fines. A minimum of 2 to 3 feet of soil would cover all cells returned to land surface.

"Following backfill of a cell to an elevation above the historical high water table with fines or overburden, the upper 2 feet of soil that had been separately salvaged would be placed on the surface in one or more lifts. The cells reclaimed to land surface would be reclaimed to the approximate pre-mining elevation. Thus, the separation between the post-reclamation land surface and the historical high groundwater elevation would be no less than the conditions prior to mining. Surface contouring of the replaced materials would be completed to establish proper drainage for return to agriculture."

30.

The DEIR goes on to list actions to be taken to minimize inadvertent contamination of groundwater during operations and to control erosion during operations. A table is included with a summary of reclamation standards and actions.

In addition, subsection 3.3.3.1 of the DEIR, "Current Water Consumption and Project Water Use," describes the current and past water use at the Project site for agricultural irrigation. It explains that irrigation water is supplied from a combination of surface water from irrigation ditches and pumped groundwater. Of the 850 acres proposed for mining, current water applications total approximately 4,585 acre-feet per year, of which about 48 percent is pumped groundwater and 52 percent is surface water supplied from irrigation ditches. The DEIR then describes the water usage of the Project:

> "The total water usage for the Proposed Project includes water that will be used for mining and production activities, and water that evaporates from the mine pits. Water usage for mining and production activities will remain relatively constant over time. Water that evaporates from the mine pits will reach its maximum amount at the conclusion of the mining activities, assuming that reclamation is conducted concurrently with mining."

### b.     Analysis

"The project description must contain sufficient specific information about the project to allow the public and reviewing agencies to evaluate and review its environmental impacts. A project description that omits integral components of the project may result in an EIR that fails to disclose the actual impacts of the project." (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 26.)

In this case, the project description informs readers that, after the proposed mining is complete and the reclamation plan is implemented, a portion of the mined land (about 25 percent) will be returned to the premining use of agriculture, existing roads on the Project site will remain, and water basins will cover the remaining mined land. Readers would also learn that the slopes of the water basins are intended to be 2:1 (h:v) and that water evaporation from the basins will reach its maximum during the postmining period.

31.

### i. *Engineered grading and drainage plan*

Petitioner contends the project description is inadequate because it lacks an engineered grading and drainage plan. We disagree. In *Dry Creek*, *supra*, 70 Cal.App.4th 20, the Court of Appeal rejected a similar argument. In that case, the EIR for a proposed expansion of a surface mining operation described proposed mitigation measures of a bypass channel, cutoff walls, and in-stream diversion structures. (*Id*. at pp. 23, 27.) The EIR provided information on these structures, but did not include engineering designs. The bypass channel, for example, was described as "an 'earthen unlined channel which will have a 10-foot-wide bottom and 2:1 slopes and a depth of 10 feet,'" and schematic cross-section illustrations of the channel were provided. (*Id*. at pp. 28-29.) As a condition of project approval, the bypass channel was to be designed by a registered engineer and approved by the lead agency. (*Id*. at p. 31.) The appellants argued, however, that "only precise engineering designs [in the project description] provide the necessary detail to analyze the environmental consequences" of a project. (*Id*. at p. 27.)

In rejecting the appellants' position, the court explained that CEQA requires a "general description" of the project's technical characteristics (Guidelines, § 15124, subd. (c)), and "'[g]eneral' means involving only the main features of something rather than detail or particulars." (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 28.) The court also reasoned: "The 'general description' requirement for the technical attributes of a project is consistent with other CEQA mandates to make the EIR a user-friendly document. For example, Guidelines section 15140 states that EIR's must be written in plain language so that decisionmakers and the public can rapidly understand them. The general description requirement also fosters the principle that EIR's should be prepared early enough in the planning stages of a project to enable environmental concerns to influence the project's design. [Citations.] A general description of a project element can be provided earlier in

the process than a detailed engineering plan and is more amenable to modification to reflect environmental concerns." (*Ibid.*)

The court concluded:

> "Appellants have not established that the general description of the diversion structures in the EIR coupled with approval of final designs after the project is approved violated any CEQA mandate. Courts should not interpret CEQA to impose procedural or substantive requirements beyond those explicitly required in the statutes or CEQA Guidelines. [Citations.] … CEQA requires a 'general description' of the technical aspects of the stream diversion structures of the project. The description must contain sufficient detail to enable the public and the decisionmakers to understand the environmental impacts of the proposed project. The description cannot narrow the scope of environmental review or minimize the project's impacts on the environment. [Citations.]

> " … None of appellants' contentions demonstrate that the description of the water diversion elements was insufficient to understand the environmental impacts of the proposed project. Nor do they demonstrate that the descriptions narrowed the scope of environmental review or minimized environmental impacts. In addition, appellants do not explain how more detailed engineered drawings would allow the public and decisionmakers to 'fully understand the environmental consequences of the entire project.' In fact, engineered drawings may well supply 'extensive detail beyond that needed for evaluation and review of the environmental impact' in violation of Guidelines section 15124. Accordingly, appellants have not demonstrated the water diversion structures are inadequately described in the EIR." (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 36.)

Here, the EIR provides a similar level of detail regarding the water basins as found in the EIR in *Dry Creek* regarding the water diversion structures. The EIR's project description includes specifications and schematic cross-section illustrations of the water basins. (See Figures 3-18 and 3-19 in the DEIR.) Following the reasoning of *Dry Creek*, we reject petitioner's claim that CEQA *requires* the EIR's project description in this case to include an engineered grading and drainage plan.

Petitioner's attempt to distinguish *Dry Creek* is not convincing. Petitioner cites a letter dated July 9, 2012, from the Department of Conservation's Office of Mine

33.

Reclamation (OMR) reviewing the Project's reclamation plan. (This is the state agency's review of the reclamation plan, conducted pursuant to section 2774 of SMARA, as described above.) In the letter, the OMR recommended that the applicant consult with the Regional Water Quality Control Board (RWQCB) to determine requirements applicable to the Project and also wrote that "the revised reclamation plan must include a water balance for Post Mining Conditions." County consulted with the RWQCB and prepared a response to the OMR dated July 10, 2012. County added as a condition of approval for the CUP that an engineered grading and drainage plan would be prepared by a registered engineer. This is similar to the condition of approval in *Dry Creek*, *supra*, 70 Cal.App.4th at page 31. County also added a condition of approval that, prior to commencement of mine operations, a calculated water balance for postmining conditions would be submitted to County for review and approval. In a letter dated August 8, 2012, the OMR responded to County's letter, indicating that it would not consider the reclamation plan complete until the applicant complied with the conditions of approval prior to the commencement of mining activities.

The OMR's comments on the reclamation plan, made pursuant to SMARA (§ 2774, subd. (d)), do not support petitioner's claim that the project description is inadequate under CEQA. The OMR's comments were directed at SMARA compliance, not CEQA compliance. Further, a project description "should be prepared early enough in the planning stages of a project to enable environmental concerns to influence the project's design" (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 28), while the OMR generally reviews and provides comments on the reclamation plan much later in the environmental review process.[16] In the present case, for example, the OMR reviewed the reclamation

---

[16] Section 2774, subdivision (c) provides that, when a lead agency submits a reclamation plan for review, the agency must also submit "information from any related document prepared, adopted, or certified pursuant to [CEQA]," suggesting that a related EIR may be certified at the time the OMR reviews the reclamation plan.

34.

plan after the FEIR was circulated. Petitioner asserts that SMARA and its regulations require engineering-level details and "[t]hese requirements inform the analysis in this case regarding what level of detail is necessary in an EIR for a reclamation plan." But petitioner offers no authority for the proposition that an EIR's project description must comply with the OMR's recommendations regarding SMARA compliance in order to comply with CEQA. Even as a SMARA matter, the statute does not *require* the lead agency to implement recommendations offered by the OMR. (See § 2774, subd. (d)(2) [requiring lead agency to provide written responses when it does not accept recommendations of state agency].) We see no reason to find the project description inadequate because the OMR recommended including additional information pursuant to SMARA.

### ii. *Water balance calculation*

Petitioner also contends that the project description is inadequate because it lacks a water balance calculation. It argues that, without the water balance, there is no substantial evidence or information regarding postmining water consumption and potential contamination. Petitioner does not explain what a "water balance calculation" is or why it is necessary. (See *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 222 ["we are left to guess at what a 'water balance study' might be or why it was necessary in this instance"].) We gather from appendix J-4 to the DEIR that "a water balance analysis," also referred to as a "water budget," may refer to "a simple equation that sums inflows and outflows [of water] to the project area."

Appendix J-4 to the DEIR is a hydrology technical report dated June 15, 2011. It provides a water budget for the Project, which includes tables labeled "Water Balance" showing the yearly inflows and outflows of water for four scenarios: (1) the baseline conditions on the site, (2) mining above the water table, (3) dry mining, and (4) wet mining. In the baseline condition of growing fruit trees, for example, the inflows are rainfall, estimated groundwater recharge from rainfall, and estimated groundwater

35.

recharge from applied water (irrigation), while the outflows are estimated groundwater pumping, irrigation ditches, and transpiration by the fruit trees.

Although the EIR does not provide a water balance table for the postmining period, respondents and real parties in interest assert the EIR contains the necessary information and analysis regarding postmining water consumption. They point to section 4.9 of the DEIR, which considers potential impacts of the Project to hydrology and water quality. The DEIR states that a water supply assessment for the Project was prepared and the assessment concludes that the Project's water demand is less than the current irrigation water use. The DEIR continues, "In addition, at the completion of mining, up to 2,175 [acre-feet per year] of evaporation from the reclaimed mining pits may occur during normal water level conditions. This volume of water is less than the current groundwater pumping and irrigation application for the same acreage."

The water supply assessment itself is included as appendix J-5 to the DEIR. It explains the basis for the conclusion that the reclaimed site will use less water than it currently uses:

> "It is estimated that once mining is completed, approximately 565 acres of water surface will be exposed (based on current average groundwater elevations). The annual lake evaporation rate at the site is 46.2 inches per year …. Therefore, the annual evaporation from the water surface after mining is completed will be approximately 2,175 [acre-feet per year]. For comparison purposes, this volume of water is much less than the 3,050 [acre-feet per year] of current net irrigation application for 565 acres of orchard. [¶] … [T]he post-mining evaporation of groundwater from the reclaimed mining pits is less than the current irrigation rate of the same acreage …."

Thus, contrary to petitioner's argument, the EIR provides evidence and information regarding postmining water consumption.[17]

---

[17]    In its reply brief, Friends argues that the EIR's discussion of evaporation of the water basins is not a sufficient discussion of postmining water use. It argues there is no information in the record regarding how much water will be pumped from the water basins for irrigation. Their

Petitioner does not explain why a water balance analysis would be needed in order to understand the potential for water contamination in the postmining period. We observe that the DEIR addresses whether the Project would provide a substantial additional source of polluted runoff and whether the Project would cause a violation of water quality standards or otherwise degrade water quality. The DEIR explains that groundwater would be exposed in the water basins following reclamation. It identifies mechanisms that could degrade groundwater quality (such as pesticide overspray or irrigation runoff) and describes steps to be taken to avoid potential contamination. Thus, again contrary to petitioner's argument, the EIR provides evidence and information regarding the potential for postmining water contamination.

Petitioner has failed to show that a postmining water balance is necessary to understand the Project's impacts on water consumption or potential contamination. Consequently, we reject its argument that the project description is inadequate because it lacks a postmining water balance calculation. (*Dry Creek*, *supra*, 70 Cal.App.4th at p. 36.)

> D.     ***Substantial evidence regarding EIR's conclusions on groundwater supplies, adjacent riparian vegetation, and Byrd Slough****[*]

Petitioner argues there is no support for the EIR's conclusions that the Project will not impact groundwater supplies and adjacent riparian vegetation. It asserts there is "significant evidence in the record" showing that the Project will impact Byrd Slough and the oak woodlands adjacent to the Project.

---

opening brief, however, refers only to the loss of the water from evaporation. We need not consider this argument, which is raised for the first time in the reply brief and which the other parties have no opportunity to respond to. Further, it is unclear what petitioner's concern about using the water basins for irrigation is. If water from the water basins is used to irrigate the orchards, presumably the same amount of groundwater would not need to be pumped from wells, resulting in no net increase in water consumption.

[*]     See footnote, *ante*, page 1.

We understand petitioner's argument to be that the EIR's conclusions regarding the Project's potential impacts to groundwater supplies, adjacent oak woodlands, and Byrd Slough are not supported by substantial evidence. As a preliminary matter, even if "significant evidence in the record" could support different conclusions, this does not demonstrate the EIR's conclusions are not supported by substantial evidence. The relevant inquiry in a substantial-evidence challenge is whether there is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support [the EIR's] conclusion, *even though other conclusions might also be reached*." (Guidelines, § 15384, subd. (a), italics added; see *Laurel Heights I*, *supra*, 47 Cal.3d at p. 407 ["The question … is not whether there is substantial evidence to support [the petitioner's] position; the question is only whether there is substantial evidence to support [the lead agency's] conclusion."].)

We consider whether substantial evidence supports the EIR's conclusions regarding groundwater supplies, adjacent oak woodlands, and Byrd Slough.

### 1. *Groundwater supplies*

The EIR reports that the amount of water that would be lost due to evaporation from reclaimed water basins would be less than the current amount of water used for irrigation. It concludes, "Future evaporative loss would be less than the baseline net irrigation demand and therefore impacts from evaporative losses are determined to be less than significant."

Friends challenges this conclusion, citing a written comment on the FEIR by David Cehrs, "Ph.D. (Hydrology[)], R.G., C.H.G." In a document titled "Response to Carmelita Mine and Reclamation Project FEIR, May 2012," Cehrs wrote that the EIR's conclusion that the reclaimed ponds will use less water than stone fruit is incorrect. He asserted that County and the applicant "do not know the difference between applied

38.

water/consumptive use on a crop and the evapo-transpiration (ET) demand of the plant."[18]  According to Cehrs, the ET for stone fruit is 2.8 acre-feet per acre, which is less than the projected evaporation of 3.85 acre-feet per acre attributable to the reclaimed water basins.  He argued:  "Thus, there will be a permanent loss of 1.05 [acre-feet per acre] of water from the groundwater filling the ponds in perpetuity.  For the project this means a permanent yearly loss of 612 [acre-feet] of water from the groundwater system.  This is significant."  (Underlining omitted.)

The applicant provided a response to Cehrs's letter, prepared by Andrew Kopania, principal hydrologist of EMKO Environmental, Inc., which prepared the water supply assessment at appendix J-5 to the DEIR.  Kopania responded:

> "One comment misrepresents the information presented in the EIR.  The total amount of water applied for irrigation on the Project site is currently approximately 5.4 acre-feet per acre … (see page 12 of Appendix J-1 of the Draft EIR and page 4.9-22 of the Draft EIR).  The consumptive use of the orchards is estimated to be 4 [acre-feet per acre], based on data presented by the California Department of Water Resources (1975 and 1986, as cited in Appendix J-1).  There are numerous websites and references that provide crop water use values for various crops, and these values can vary widely.  The County has determined that the values considered in the EIR are appropriate for this evaluation and accurately reflect actual water use under existing conditions at the Project site."

Appendix J-1 to the DEIR (the hydrology and water quality environmental assessment cited by Kopania) states:  "[T]he average annual irrigation application is approximately 5.4 [acre-feet per acre], whereas the net consumptive use of water by the orchards is approximately 4 [acre-feet per acre].  Applied water in excess of consumptive

---

**18**　　Appendix J-1 to the DEIR is a hydrology and water quality environmental assessment prepared for the Project.  It defines ET as "the amount of rainfall and applied water (e.g. for irrigation or dust control) that is lost to both surface evaporation and transpiration from plant surfaces."

use percolates to groundwater." (Thus, the EIR does account for the difference between applied water and the water demand or ET of the orchards.)

We conclude that the DEIR, together with appendices J-1, J-4, and J-5 (discussed above), provide substantial evidence for the EIR's conclusion that the reclaimed water basins will consume less water than is currently used by the orchards and, therefore, the postmining condition of the Project site will not result in a significant impact to groundwater supplies.

The EIR uses an estimated water use rate for the orchards of 4 acre-feet per acre, based on data from the California Department of Water Resources, while Cehrs argued the fruit trees consume water at a rate of 2.8 acre-feet per acre. It is not our role to decide the appropriate rate for estimating the water consumption of fruit trees; nor do we have the scientific expertise to do so. (See *Laurel Heights I*, *supra*, 47 Cal.3d at p. 393 [noting the court has neither the resources nor scientific expertise to determine which party has a better argument in dispute over whether adverse effects have been mitigated].) Our role is limited to determining whether substantial evidence supports the EIR's conclusion, which we have done. Petitioner has shown there is a disagreement between two hydrologists, but it is well-established that a disagreement among experts does not make an EIR inadequate. (*Id*. at p. 409.) County was free to choose the EIR's analysis over the different analysis offered by Cehrs. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 (*Irritated Residents*) ["When the evidence on an issue conflicts, the decisionmaker is 'permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others.'"].)

Petitioner also argues that an "essential report and analysis was omitted," referring again to the absence of a postmining water balance calculation. However, even if a water balance calculation for the postmining period might have been helpful, this does not show that CEQA *requires* it. (*Irritated Residents*, *supra*, 107 Cal.App.4th at p. 1396 ["The fact

that additional studies might be helpful does not mean that they are required."].) Accordingly, we reject petitioner's substantial-evidence challenge to the EIR's conclusion regarding groundwater supplies.

### 2. Oak woodlands

As we have described, the EIR concludes that the Project's mining operations would have a less than significant impact on groundwater supplies. The DEIR explains: "Consumptive use of water at the Project Site is greater under baseline conditions than under dry and wet mining conditions associated with the Proposed Project because the stone fruit trees require more water per acre than that required for mining. Even though more groundwater would be pumped if dewatering was selected to dry mine the deeper portions of a mining cell, the pumped water would be returned to the aquifer through an adjacent mining cell, or used for irrigation or aggregate operations, which would offset groundwater pumping that would otherwise occur."

After the DEIR was circulated for public review and comment, County received several comments expressing concern that the Project could affect oak trees in areas adjacent to the Project site. The FEIR includes a response, "Collective Response 4," to this concern:

> "[T]he Project would not affect the water table in a greater amount than has occurred under baseline conditions, to which the subject habitat is adapted. Therefore, no significant impacts are foreseen.
>
> "Based on information distributed by the United States Fish and Wildlife Service (USFWS) [citation], the greatest problem facing the Valley oak is sapling recruitment and loss of mature trees. Valley oaks have died in some areas because of substantial and long-term lowered water tables, a situation that would not occur as result of implementing the Project. Mature trees are also sensitive to overwatering, pruning, grade changes, and blankets of asphalt covering the root system. However, the trees are resistant to short-term drought and mature trees exhibit drought damage only after a series of dry years occur and result in the groundwater surface declining to depths in excess of 70 feet below ground surface, which is deeper than the maximum depth of mining and potential

41.

dewatering for the Project. Furthermore, Valley oak trees typically have several vertical roots that tap groundwater and extensive horizontal root branches. Vertical root depth has been measured as deep as 80 feet in some individuals [citation].

"The California Oak Foundation provides recommendations regarding minimization of impacts to oak trees and woodlands. The Foundation recommends avoiding disturbance within the root protection zone, which is an area surrounding the tree 1.5 times as large as the area from the trunk to the dripline.… The distance between the nearest oak trees and Project disturbance areas are outside this root protection zone for each oak tree in the area and no oak trees are located in the mining areas.…"

Petitioner argues that, contrary to the EIR's conclusion, the Project will affect oak-savanna habitats. Petitioner relies on Cehrs's comment on the FEIR. Cehrs wrote that pumping perimeter mining cells dry for gravel extraction (i.e., dewatering for dry mining) would significantly adversely affect neighboring properties and their oak-savanna riparian habitats. He suggested that dry mining "should be located at least 1,500 feet away from the project site boundary to protect neighboring parcel oak-savanna habitats." Respondents and real parties in interest point out that Cehrs's assertion that oaks would be adversely affected by dewatering was not supported by any technical studies or other data. Cehrs cited appendices J-1 and J-4 of the DEIR, but these reports do not conclude that oak woodlands would be affected by dewatering activities. Instead, appendix J-4 supports the EIR's conclusion.

Appendix J-4 includes analysis of the effect dewatering might have on off-site well owners. It determines that, in a worst case scenario of pumping 24 hours per day, 365 days a year (which is unlikely to occur), dewatering an individual mine cell could cause groundwater levels to drop by 5 to 20 feet at the boundary of the proposed Project. Appendix J-4 notes that "[a]vailable data indicate groundwater elevations in the Project area fluctuate more than 5 to 50 feet." As a result, it concludes, "the effects of dewatering are less than what has occurred historically." This information supports the collective response that no significant impacts to nearby oaks are foreseen because

42.

historical fluctuations in the groundwater level have been greater than any fluctuation (lowering) that may be caused by dewatering activities. Together with the information in Collective Response 4 itself, this was substantial evidence supporting the conclusion the Project would not have a significant impact on oak woodlands. Cehrs's comment to the FEIR did not dispute the historical water table data, nor did he refute the information that oaks are resistant to short-term drought and exhibit damage only after a series of dry years.

Finally, petitioner cites appendix F-2 to the DEIR, but this document does not demonstrate that the EIR lacks substantial evidence regarding oak trees. Appendix F-2 is a memorandum prepared by URS, an engineering consulting company, titled "Carmelita Project EIR Technical Report Review" reviewing a biological resources environmental assessment report for the Project dated July 2010. Petitioner relies on the following recommendation from URS: "Additional information should be obtained to assist in the assessment of impacts to riparian forest … communities west of the project site." As respondents and real parties in interest note, however, petitioner fails to mention that, after reviewing the biological resources report, URS itself prepared the hydrology technical report at appendix J-4 to the DEIR. As we have seen, appendix J-4 *supports* the FEIR's conclusion that the Project will not have a significant impact on groundwater levels and, therefore, will not significantly impact adjacent oak trees. In appendix J-4, URS further concludes that the Project "will not affect conditions along Byrd Slough," which is a slough located immediately west of the Project site. This appears to satisfy URS's own recommendation for additional information "to assist in the assessment of impacts to riparian forest … communities west of the project site."

In sum, substantial evidence supports the EIR's conclusion regarding adjacent oak woodlands.

### 3. Byrd Slough

Byrd Slough is associated with the Kings River and, as mentioned, is located immediately west of the Project site. The DEIR addresses Byrd Slough as follows:

"Appendix J-4, Figures 2 and 3 present water level data dating back to 1946 from wells in the vicinity of Byrd Slough. During the period shown, groundwater levels have been at least six feet below ground surface, and typically much deeper than that. In addition, the groundwater surface slopes toward the southeast, away from the slough and the larger Kings River system. Historical lowering of the groundwater table, as occurs seasonally due to irrigation pumping, and longer-term due to climatic cycles, does not affect the flow or riparian conditions along the slough. Historic fluctuations of the water table have been as much as 50 feet.

"Since the ground water elevation has been below the base of the slough throughout the entire period of monitoring shown on Figures 2 and 3 of Appendix J-4, the groundwater and surface water in Byrd Slough are hydraulically disconnected, such that fluctuations in groundwater levels do not affect flow in the slough. Fluctuations in groundwater levels do not affect surface water in Byrd Slough and related habitat, as demonstrated by the wide fluctuations in groundwater levels that have been measured since the 1940s. Based on the assumptions and results of modeling conducted for the report presented as Appendix J-4, it is anticipated that the Proposed Project's impact to Byrd Slough will be less than significant."

Appendix J-4 provides substantial evidence in support of the EIR's conclusion that the Project will not have a significant impact on Byrd Slough. Petitioner asserts "significant evidence in the record show[s] that the Project will indeed impact Byrd [S]lough," but even if this were so, this does not make the EIR inadequate. (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 407.) Further, petitioner's cites to the record—Cehrs's comment on the FEIR, the OMR's review of the reclamation plan from July 9, 2012, and URS's technical report review—do not show the Project will have significant impact on Byrd Slough. Petitioner's argument that no substantial evidence supports the EIR's conclusion regarding Byrd Slough is without merit.

#### 4. Hydrology

We generally address Friends' appellate arguments in the order they are presented in its opening appellate brief. We deviate from this practice to note that, later in its brief, petitioner argues, "The EIR failed to adequately address other areas of impact," including hydrology. Petitioner's entire argument on hydrology is as follows:

> "As set forth in detail above, the EIR grossly mischaracterizes water consumption by the proposed Project, fails to evaluate run-off from the Project site, fails to analyze the potential for water contamination through the 600 acres of open pits filled with groundwater, and fails to adequately analyze the impacts of groundwater drawdown on adjacent landowners and habitat. The failure of the County to require preparation of a post-mining water balance also prevented the County from disclosing Project impacts, and analyzing and mitigating those impacts."

We have concluded that petitioner's arguments regarding groundwater and other water-related issues are without merit. It follows that petitioner's argument that the EIR inadequately addresses hydrology also fails.

### E. Mitigation for loss of farmland

The EIR determines that the Project will result in the permanent loss of almost 600 acres of farmland and concludes that this is a significant impact. Petitioner asserts County failed to require mitigation for the conversion of farmland to other uses in violation of CEQA. We begin with a brief discussion of the law on mitigation.

#### 1. CEQA's mitigation requirement

In section 21002 of CEQA, the Legislature declared, "[I]t is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects .…" Section 21002 has been described as a "substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures." (*Mountain Lion*

*Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 (*Mountain Lion*).)  This substantive mandate "is effectuated in section 21081."  (*Ibid.*)

"Under [section 21081], a decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and mitigation measures.  [Citations.]  The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision.  [Citations.]  Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures."  (*Mountain Lion*, *supra*, 16 Cal.4th at p. 134.)[19]

---

**19**     Section 21081 provides:

"Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:

"(a) The public agency makes one or more of the following findings with respect to each significant effect:

"(1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.

"(2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.

"(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report.

"(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

46.

An EIR must describe "feasible measures which could minimize significant adverse impacts." (Guidelines, § 15126.4, subd. (a)(1).)[20] "Where several measures are available to mitigate an impact, each should be discussed and the basis for selecting a particular measure should be identified." (*Id.*, subd. (a)(1)(B).)

"'Mitigation'" includes: "(a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments." (Guidelines, § 15370.) "'Feasible'" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.)

### 2. *Background*

Section 4.2 of the DEIR addresses potential impacts of the Project on agricultural and forestry resources. The DEIR explains that a maximum of 583 acres of farmland would be permanently lost from agricultural production as result of the Project. This would occur over the course of 100 years at an estimated rate of 5 to 24 acres lost per year.

The DEIR states that it is not possible to reclaim the entire site to agricultural land due to the existing water table. It continues:

---

[20]  "'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382.)

"Fresno County does not have an established farmland protection program or uniform agricultural conservation banking program to which the Applicant could contribute. However, the Applicant does have large agricultural land holdings on which agricultural easements could be placed. Securing these parcels in an agriculture easement would not reduce the number of acres lost to agricultural production, nor would it increase the number of acres under Williamson Act contract.

"Given the lack of feasible mitigation, the conversion of prime farmland, unique farmland, farmland of statewide importance, and farmland of local importance is a significant and unavoidable impact."

Three mitigation measures are recommended. Mitigation Measure AG-1 provides that the current agricultural use of the Project site would continue until the land is prepared for mining activities. Mitigation Measure AG-2 requires the applicant to ensure that 602 acres within the Project site but outside the surface disturbance boundary are maintained as an agricultural buffer zone for the life of the CUP, which is estimated to be 100 years. Mitigation Measure AG-3 requires the applicant to reclaim mine cells to farmland as adequate materials are generated to fill the empty mine cells.

The DEIR concludes that, after the implementation of the recommended mitigation measures, "the conversion of farmland to another land use remains a significant and unavoidable impact."

County received several public comments to the DEIR about the loss of farmland caused by the Project, and Collective Response 6 of the FEIR addresses this concern. Some commenters suggested that the Project should mitigate the loss of farmland by establishing permanent agricultural conservation easements (ACEs) at a ratio of between one and two acres of preservation for each acre of farmland lost. A few commenters referred to a draft County policy called "Farmland Mitigation Program for Fresno

48.

County's Sanger River [B]ottom [Mineral Resource Zone] Area Due to Gravel Mining."[21]

Collective Response 6 explains, "The County's decision makers have not formally considered nor approved, nor has County staff recommended, adoption of a farmland mitigation program." The response continues:

> "Approximately 35 acres (6 percent) of the Project disturbance area are Prime Farmland …, all of which would be replaced by mine reclamation backfill to create Prime Farmland of equal acreage .… As stated in the Project objectives, one reason the Project Site is proposed as a mining site is because of the rocky soils .… Reclamation would involve backfill of approximately 240 acres to surfaces that would again be capable of supporting tree crops. Removal of cobbles and gravels from the soils before soils are replaced would remove one of the primary limitations of the site soils in their present condition.… Production records indicate that the existing site soils produce 20 percent less fruit on average than the same trees on soils without the cobbles. Therefore, the reclaimed soils are expected to be 20 percent more productive per acre than under existing conditions. The reclaimed lands would be returned to agricultural lands of equal or better quality of that currently existing on the site. In addition, … Mitigation Measure AG-1 require[s] phasing of the Project's mining activities to ensure that areas to be mined remain in agricultural production as long as practicable.

> "Mitigation Measure AG-2 requires that the Applicant ensure that 602 acres of farmland within the Project Site, but outside of the Project's mining disturbance area boundary, be maintained as an agricultural buffer zone and remain in agricultural production for the life of the [CUP], estimated at 100 years. This mitigation measure therefore requires preservation of farmland at a 1:1 ratio during the life of the Project. While this preservation requirement is not in perpetuity, as would occur under a conservation easement, implementing this mitigation measure would mitigate the temporal loss of agricultural land during the life of the Project. In addition, no settled statutory or published CEQA case law exists that mandates mitigating loss of farmland using conservation easements [citations].

---

[21] None of the parties offers a record citation for this draft policy, and we have not located it in the record.

49.

"Mitigation Measure AG-3 would accelerate the return to farmland of certain mined areas, and the Reclamation Plan requires that approximately 240 acres of the Project be reclaimed to agricultural use as soon as possible.

"However, even with implementation of the mitigation identified in the Draft EIR, the County considers the permanent loss of up to 583 acres of farmland to represent a significant impact under CEQA. Permanent preservation through a farmland conservation easement would not reduce the amount of farmland permanently converted as result of the Project. A conservation easement would not 'replace or provide a substitute resource' (CEQA Guidelines § 15370[, subd. ](e)) for the permanent loss of 583 acres of farmland, which is unique and would be lost permanently. Accordingly, a conservation easement would not mitigate the impact to a less-than-significant level or substantially reduce the severity of the impact, as would Mitigation Measures AG 1-3."

### 3. Analysis

Petitioner initially contends County violated CEQA by failing to require mitigation for the conversion of farmland to other uses. It asserts, "The EIR for the Project, however, does not include any specific measures to mitigate the adverse environmental impact of eliminating important farmland." This is not correct. The EIR recommends three mitigation measures, which the County approved. Pursuant to the MMRP, the public works department is responsible for enforcement of the mitigation measures, and compliance is to be monitored in yearly mine inspections. Mitigation Measure AG-2, for example, requires the applicant to maintain 602 acres in agricultural production for the life of the CUP. Thus, the EIR does include specific measures to mitigate the loss of farmland, and petitioner's contention that County failed to require mitigation is without merit.

Petitioner next argues that the EIR fails to evaluate feasible mitigation measures. We disagree. "If more than one mitigation measure is available, the EIR must discuss each and describe reasons for the measure or measures it selects." (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 724, citing Guidelines, § 15126.4, subd. (a)(1)(B).) Here, County considered ACEs as a possible

50.

mitigation measure along with the three mitigation measures recommended in the DEIR. In Collective Response 6, the FEIR discusses ACEs, comparing them to the recommended mitigation measures of continuing agricultural production until each cell is ready to be mined, saving the topsoil and overburden to reclaim some of the mined land to farmland, and requiring a 600-acre agricultural zone within the Project site. The FEIR notes that Mitigation Measure AG-2 preserves farmland at a 1:1 ratio for the life of the Project, which is 100 years. Accordingly, we reject petitioner's contention that the EIR fails to evaluate feasible mitigation measures.[22]

Petitioner also appears to take the position that County was required to adopt the use of ACEs as a mitigation measure as a matter of law. Petitioner asserts, "[F]ailure to require compensatory mitigation is a violation of the law."

Petitioner relies on *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 238 (*Masonite*), in which the Court of Appeal held, "ACEs may

---

[22]    We recognize that the DEIR states there is a "lack of feasible mitigation" for the conversion of farmland. The DEIR, however, goes on to recommend three mitigation measures that are intended to lessen the Project's impact on farmland. Thus, we do not read the DEIR as concluding there are no measures that would minimize or compensate for the impact (mitigation), which are capable of being accomplished in a successful manner (feasible). Rather, in context, it is apparent that the DEIR means no feasible measures are available that would mitigate the impact to a less-than-significant level. This is a common use of the phrase "feasible mitigation."

For example, in *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296 (*Lodi*), a case involving a proposal to build a shopping center on farmland, the lead agency found there were "no feasible mitigation measures" because no mitigation could avoid the significant impact resulting from the permanent loss of farmland. (*Id*. at pp. 301, 323.) The lead agency went on to require the project applicant to acquire an ACE. (*Id*. at p. 322.) The Court of Appeal found substantial evidence to support the lead agency's finding that "there were no feasible mitigation measures," although the court also noted that the ACE requirement "would minimize and substantially lessen the significant effects" of the project. (*Id*. at p. 324.) Since the *Lodi* court expressly recognized that the ACE requirement would mitigate a significant impact, it is clear the court intended the phrase "there were no feasible mitigation measures" to mean there were no feasible mitigation measures that would reduce the project's impact to a level of insignificance. (*Ibid*.)

appropriately mitigate the direct loss of farmland when a project converts agricultural land to a nonagricultural use." This case does not support petitioner's position.

In *Masonite*, Mendocino County approved a project for a sand and gravel quarry on a site where vineyards were cultivated. (*Masonite*, *supra*, 218 Cal.App.4th at p. 233.) The EIR for the project rejected the use of ACEs as a possible mitigation measure. The EIR explained the county's understanding that an ACE only mitigates "'the indirect and cumulative effects of farmland conversion,'" such as "'pressure created to encourage additional conversions'" of nearby farmland, but an ACE does not mitigate the direct loss of farmland because it "does not replace the on-site resources" of prime farmland. (*Id.* at p. 236.) The EIR went on to conclude that the project would not create indirect development pressure on agricultural lands and, as a result, "'feasible mitigation measures are not available.'" (*Ibid.*) The planning commission adopted a statement of overriding considerations. (*Id.* at p. 234.)

The Court of Appeal disagreed with the EIR's discussion of ACEs. The court explained: "The County presumed that ACEs were useful only to address 'the indirect and cumulative effects of farmland conversion,' and were not needed here because the Project would have no such effects. Thus, the finding of infeasibility in the EIR rested on the legal conclusion that while ACEs can be used to mitigate a project's indirect and cumulative effects on agricultural resources, they do not mitigate its direct effect on those resources." (*Masonite*, *supra*, 218 Cal.App.4th at p. 238.) The court rejected the county's presumption and legal conclusion, holding: "We conclude that ACEs may appropriately mitigate for the direct loss of farmland when a project converts agricultural land to a nonagricultural use, even though an ACE does not replace the onsite resources. Our conclusion is reinforced by the CEQA Guidelines, case law on offsite mitigation for loss of biological resources, case law on ACEs, prevailing practice, and the public policy of this state." (*Ibid.*)

The court reasoned that ACEs "compensate" for the loss of farmland within the Guidelines' definition of mitigation. (*Masonite*, *supra*, 218 Cal.App.4th at p. 238, citing Guidelines, § 15370, subd. (e).) It noted that case law has recognized off-site preservation of habitats for endangered species as an accepted means of mitigating impacts on biological resources, and that ACEs serve a similar function. (*Id*. at pp. 238-239 [citing cases on use of conservation of off-site habitat as mitigation].) Considering case law on ACEs, the *Masonite* court cited *Lodi*, *supra*, 205 Cal.App.4th 296. (*Masonite*, *supra*, at p. 239.) In *Lodi*, the court observed that requiring the project applicant to acquire an off-site ACE "would minimize and substantially lessen the significant effects of the proposed project." (*Lodi*, *supra*, at p. 324.) The *Masonite* court further explained that ACEs "are commonly used" to mitigate the loss of farmland. (*Masonite*, *supra*, at p. 240.) Finally, the court relied on the Legislature's repeated declarations that "the preservation of agricultural land is an important public policy." (*Id*. at pp. 240-241 [citing statutes].)

The court concluded: "To categorically exclude ACEs as a means to mitigate the conversion of farmland would be contrary to one of CEQA's important purposes.… ACEs should not 'be removed from agencies' toolboxes as available mitigation' for this environmental impact." (*Masonite*, *supra*, 218 Cal.App.4th at p. 241.) Therefore, the court required Mendocino County to "explore[]" the economic feasibility of off-site ACES to mitigate the project's impact on the loss of 45 acres of prime farmland. (*Ibid*.)

In sum, the *Masonite* court held that ACEs may mitigate the direct loss of farmland and that the lead agency in that case erred by failing to consider ACEs as a potential mitigation measure for this direct loss. We do not read *Masonite*, however, to stand for the proposition that CEQA *requires* the use of ACEs as a mitigation measure in every case where ACEs are economically feasible and the project causes the loss of farmland. In *Masonite*, the lead agency did not believe ACEs were applicable and apparently did not adopt any mitigation measures to address the loss of farmland caused

53.

by the project.  Here, in contrast, County did not "categorically exclude ACEs as a means to mitigate the conversion of farmland." (*Masonite*, *supra*, 218 Cal.App.4th at p. 241.) Rather, County considered the use of ACEs along with other mitigation measures and selected the three mitigation measures recommended in the DEIR.  We decline to hold that County was required to adopt ACEs as a mitigation measure instead of the mitigation measures it did adopt.

Finally, we reject petitioner's argument that County failed to provide a reasoned response to commenters raising concerns regarding the conversion of agricultural lands to other uses.  "An agency must evaluate and respond to timely comments on the draft EIR that raise significant environmental issues.  [Citations.]  Responses must describe the disposition of the issues raised in the comments.  [Citations.]  If the agency rejects a recommendation or objection concerning a significant environmental issue, the response must explain the reasons why.  [Citation.]" (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 475.)  Other than arguing County should have required the acquisition of ACEs as a mitigation measure, petitioner does not explain how Collective Response 6 is deficient.  We do not find the response to be inadequate.

### F.  *Air quality*[*]

Section 4.7 of the DEIR addresses greenhouse gas (GHG) emissions and global climate change.  It states that the primary sources of GHG emissions from the Project include facilities' energy usage, other equipment energy usage, operation of mobile equipment, on-site and off-site delivery trucks, on-site and off-site worker vehicles, and stationary sources.

The DEIR explains that population growth correlates to growth in demand for aggregate and related construction materials.  It states that aggregate shortages in the Fresno area have resulted in rock being imported from Coalinga, a 60-mile haul, quoting

---

[*]    See footnote, *ante*, page 1.

54.

a 2006 Department of Conservation (DOC) report, "Aggregate Availability in California." It continues:

> "Delivery trucks are an aspect of the Proposed Project that may result in a regional reduction of GHG emissions. By placing a source of aggregate, ready-mix concrete, and asphalt in a location where supply does not currently meet demand the Project will result in a reduction in VMT [vehicle miles traveled] for customers. It is expected that many of the Proposed Project's customers will be located within a 30 to 60 mile roundtrip distance from the Proposed Project. In the absence of the Proposed Project, a portion of these customers would otherwise have to travel to Coalinga to obtain these materials, at a roundtrip distance of approximately 120 miles. This reduction in distance traveled for customer vehicles would result in a corresponding reduction in GHG emissions .…"

Petitioner contends the EIR's analysis is flawed because it is based on the incorrect "assumption that there is tremendous unmet need for aggregate in Fresno County." Petitioner argues there is no substantial evidence in the record to support the conclusion that there is any unmet need for aggregate in Fresno County. Petitioner offers no citations in support of this argument, but claims the "flaws in this assumption are discussed at length above" in its opening brief. Earlier in the brief, in its statement of facts, petitioner asserts, "Based upon the evidence in the record, it appears that demand has been decreasing and that Fresno County aggregate mines have been exporting material to other counties, and may continue to do so in the future." In support of this assertion, petitioner cites (1) a comment prepared by Richard Young addressing a different mining project proposal, the CEMEX Jesse Morrow mine (CEMEX project), (2) a letter from the public works department to a person at an address in Fowler regarding the recipient's approved rezoning application, and (3) a letter to the Board from Friends' attorney, Burch, appealing the planning commission's approval of the EIR.

Young wrote that projected population growth rates for Fresno County *in the DEIR for the CEMEX project* were too large. In citing Young's comment, petitioner makes no effort to show how it is relevant to the present case. Petitioner does not, for

55.

example, offer evidence showing that the population growth rates used in the Project's EIR are the same as those used in the CEMEX project. Young also wrote that there was a decrease in aggregate production from 2006 to 2007, due in part to decreased home construction. He then claimed that the recent economic downturn would "almost certainly result in even further decreases in aggregate demand for some time to come" and the analysis for the CEMEX project "does not account for the downturns." Again, petitioner does not connect Young's comments about a different EIR to the evidence in this case. The public works department letter does not appear to be relevant, and petitioner does not attempt to explain how it might be relevant. Burch's letter asserts that the EIR uses "outdated information from 2006." Yet petitioner acknowledges that the EIR "uses data from the *most recent* [California Geological Survey] study (2006)." (Italics added.) And, returning to the assertion these record cites are supposed to support, we are unable to locate anything that demonstrates "Fresno County aggregate mines have been exporting material to other counties" as petitioner claims.

In any event, as we explained above in our discussion of petitioner's substantial-evidence challenge to the EIR's analysis of water issues, the question is not whether there is substantial evidence to support petitioner's position, the question is whether there is substantial evidence to support County's conclusion. (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 407.) The EIR provides, "'Aggregate shortages in the Fresno area have resulted in rock being imported into the area from Coalinga, a 60-mile haul.' (DOC 2006, 'Aggregate Availability in California,' p. 15.)" A map prepared by the DOC, "AGGREGATE AVAILABILITY IN CALIFORNIA[;] Fifty-Year Aggregate Demand Compared to Permitted Aggregate Resources" shows that permitted sources of aggregate represent a small fraction of the 50-year demand for aggregate in the Fresno area. A planning commission staff report provides: "The shortage of aggregate throughout the Fresno region is a serious problem. As of January 1, 2006, the County had only permitted 11 percent of the region's 50-year aggregate demand, with less than 10 years of permitted

supply remaining. (Kohler, 2006.) … While this data was compiled before the recent recession, it is important to note that it is based on a 50-year forecast, and it accounts for economic expansion and contraction." A consulting firm opined in August 2012 that "the DOC's data remain the official source of reliable statewide and regional information [and are] … useful to local decision makers [and] land-use planners." This is substantial evidence supporting the conclusions that there is a need for additional sources of aggregate in the Fresno area and that a source of aggregate located closer to the Fresno area could result in fewer trucks hauling aggregate from Coalinga.

Petitioner next claims, "The terrible air quality impacts that will result from the Project may not be ignored on the basis of the unsupported claim that the Project will likely be closer to its customers than other aggregate mines, without substantial evidence to support this conclusion." We have addressed the second part of this claim. As to the first part of this claim, the EIR does not ignore the Project's impacts on air quality. Section 4.3 of the DEIR evaluates potential air quality impacts that could occur with implementation of the Project. The DEIR finds that the Project "could increase emissions of criteria pollutants and potentially violate air quality standards, or contribute substantially to an existing or projected air quality violation." Nor did County ignore the Project's potential impacts to air quality. In its statement of overriding conditions, County cited the EIR's air quality analysis and found "no feasible mitigation can reduce the Project's emissions of criteria pollutants or contributions to existing air quality violations to a less-than-significant level." Petitioner's challenge to the EIR's discussion on the Project's potential impacts on air quality and GHG emissions fails.

G.    *Noise*[*]

Petitioner contends, "The DEIR's analysis of the Project's noise impacts is flawed in many respects …." Petitioner does not explain the "many respects" in which the noise

[*]    See footnote, *ante*, page 1.

57.

analysis is supposed to be flawed except to note "there is no limit whatsoever on the nighttime operations allowed for the Project." However, we have rejected petitioner's claim that nighttime operations of the Project are unlimited in our discussion of the project description.

The DEIR recommends mitigation measures to address the Project's noise impacts. It then concludes that the noise impacts would be less than significant with the implementation of the recommended mitigation measures. Petitioner does not challenge this conclusion. Instead, it asserts that "nighttime noise impacts are the most severe" and argues that limiting nighttime operations would be a feasible mitigation measure. Petitioner offers no basis for its assertion that nighttime noise impacts would be most severe. We note that Table 4.11-16, a noise exposure assessment, indicates that the only potentially significant noise impacts would be caused by excavation activities, which would occur *during the day* (and under Mitigation Measure N-2 could occur at night *only* if it could be demonstrated through on-site noise measurements that such activities would not exceed the thresholds of significance). Petitioner has not shown that the EIR's analysis of noise impacts is inadequate.

## H.     *Revisions to the DEIR*[*]

The FEIR includes revisions to the DEIR, denominated "Errata." Petitioner challenges two of the revisions, arguing they contain "significant new information and erroneous conclusions." The first revision, Errata 3.2.11, is an addition to the EIR's discussion of potential air quality impacts. The second revision, Errata 3.2.20, adds further discussion and a new mitigation measure to the EIR's analysis of potential traffic impacts.

"Significant new information" is a term of art in the CEQA context. The consequence of adding "'significant new information'" to an EIR after the public has

---

[*]      See footnote, *ante*, page 1.

reviewed and commented on it is that the lead agency must recirculate the revised EIR for additional review and comment. (§ 21092.1; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124-1125.) The purpose of the recirculation requirement is to advance "the goal of meaningful public participation in the CEQA review process" without at the same time causing "endless rounds of revision and recirculation of EIR's." (*Id.* at p. 1132.)

The Guidelines explain that new information is significant if "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (Guidelines, § 15088.5, subd. (a).) "'Significant new information' requiring recirculation include[s], for example, a disclosure showing that: [¶] (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented. [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance. [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it. [¶] (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded. [Citation.]" (*Ibid.*)

On the other hand, "[r]ecirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (Guidelines, § 15088.5, subd. (b).)

### 1. *Errata 3.2.11*

In section 4.3 addressing air quality, the DEIR states that the regional effects of the Project may result in significant impacts by exceeding the threshold for nitrogen

oxide (NO$_x$) emission.  The DEIR explains that the greatest source of NO$_x$ emissions is customer and supplier vehicles traveling to and from the site:

> "If not for offsite NO$_x$ emissions from on-road vehicles, the impact from NO$_x$ emissions would be considered to be less than significant, and these emissions represent by far the majority of the NO$_x$ emissions from the Project.  These vehicles are owned by suppliers and customers of the Project, and the particular make, model, and emission rate of these sources are not under the control of the applicant.  Requiring that these vehicles meet emission mitigation levels[,] therefore, is not a feasible option.  In addition, although these offsite emissions are being included in the impact analysis for the Project, in reality it is likely that by supplying product to potential customers from a source closer than would otherwise be available, total NO$_x$ emissions into the airshed are expected to be reduced as result of implementing the Project .…"

The DEIR does not identify any mitigation measures to reduce NO$_x$ emissions and concludes that impacts are anticipated to be significant and unavoidable.

Errata 3.2.11 adds to the discussion of NO$_x$ emissions.  In a preface to the additional language, the FEIR explains that "County determined that the EIR should include discussion of baseline NO$_x$ emissions associated with existing conditions at the Project Site to provide a context for the Project's net NO$_x$ emissions associated with onsite activities."

Errata 3.2.11 states that the baseline condition of agricultural production involves use of equipment and vehicles that emit NO$_x$.  It further provides that, as agricultural land is removed from production for mining, the baseline emissions would reduce and "eventually there would be a net NO$_x$ [emissions] reduction from the site as compared to current agricultural practices."  The Errata explains its conclusion is based on calculations using an estimate that NO$_x$ emissions associated with existing agricultural practices are .91 tons per year for each 40-acre unit, citing Sierra Research 2012.

Petitioner argues there is no substantial evidence to support the conclusions in the Errata.  We disagree.  The information in the Errata itself is substantial evidence supporting the conclusion that, over time, the net on-site NO$_x$ emissions of the Project

60.

would be less than the emissions that would result from continuing agricultural production. In addition, the Errata is not significant new information as it does not change the EIR's conclusion that the Project may result in significant and unavoidable impacts related to NO$_x$ emissions.

### 2. Errata 3.2.20

Section 4.12 of the DEIR addresses traffic and circulation. It describes the thresholds of significance used in determining whether an impact to traffic would be deemed significant. These include impacts that "[s]ubstantially increase hazards due to a design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)," "[r]esult in an inadequate emergency access," or "[c]onflict with adopted policies, plans, or programs regarding public transit, bicycle, or pedestrian facilities, or otherwise decrease the performance or safety of such facilities."

Subsection 4.12.4.3 of the DEIR discusses "impact issues that have been determined to be less than significant." Errata 3.2.20 adds to this discussion of less-than-significant impacts and includes a mitigation measure, although the FEIR continues to find no significant impact. The new discussion language includes the following:

> "No CEQA threshold exists for establishing potential changes in risk associated with the addition of vehicles on existing roadways. Roadway safety is typically evaluated by determining whether any roadways with safety deficiencies would be adversely affected by a project. No substantial evidence exists that the study area roadways have unusual conditions or sight-distance deficiencies that would indicate that the addition of Project vehicles would create or substantially contribute to a safety hazard. [¶] … [¶]

> "Much of the truck traffic associated with the Project would travel north on Reed Avenue and west on State Route 180 and is not anticipated to use many of the County roads in the Reedley and Sanger areas (see Draft EIR Figure 4.12-2, Project Trip Distribution). Thus, Project-related trucks would not frequently travel near local schools.

> "Because no evidence exists that the Project would create an increased safety risk on public roadways, this impact is considered less than

61.

significant. However, the County acknowledges that the shared use of public roadways by heavy-duty trucks and other motorists, bicyclists, and pedestrians, requires all users to exercise a level of precaution. Notwithstanding this determination, the County will require the implementation of mitigation to further ensure that operators of Project-related vehicles obey the requirements of the California Vehicle Code by requiring that information be provided to truck drivers regarding the locations of established school bus stop locations within the Project area and to school districts about haul-truck routes."

Errata 3.2.20 then adds Mitigation Measure TC-5, which requires the Project operator (1) to provide information to drivers on Vehicle Code requirements and (2) to request maps from area school districts of bus stop locations and to provide the maps to trucking companies and drivers that enter the Project Site.

Petitioner asserts the Project will increase risks to public safety, although it does not explain the basis for this assertion. Petitioner argues that analysis must be completed and mitigation measures identified. But the EIR does analyze potential impacts to traffic safety. The EIR explains that roadway safety is typically evaluated by determining whether any roadways with safety deficiencies would be adversely affected by the Project. Petitioner disagrees with the EIR's conclusions, but it has not shown that the analysis of the potential traffic impacts is inadequate. In addition, Errata 3.2.20 does not contain substantial new information.

## I. *County's findings of fact and statement of overriding conditions*[*]

Respondents and real parties in interest argue in their response brief that petitioner has forfeited any argument regarding the sufficiency of County's findings of fact and statement of overriding considerations. We agree.

We have addressed each argument made in petitioner's "LEGAL DISCUSSION" section of its opening brief. The "LEGAL DISCUSSION" does not include a heading related to County's findings of fact and statement of overriding considerations. Petitioner's

[*] See footnote, *ante*, page 1.

62.

opening brief also includes a section called "ISSUES PRESENTED FOR REVIEW." In this section, petitioner identifies as an issue "Whether County's approval of the Project violated CEQA" and lists three separate sub-issues: (1) whether the EIR is an inadequate informational document because it lacks a complete reclamation plan; (2) whether the EIR fails to take into consideration the whole of the project where essential postmining plans and reports are missing; and (3) whether the EIR violates CEQA by failing to adequately analyze the Project's impacts or adopt appropriate mitigation measures. This section does not raise a challenge to County's findings of fact and statement of overriding considerations.

Each appellate brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation to authority …." (Cal Rules of Court, rule 8.204 (a)(1)(B).) "The requirements that issues be raised in the opening brief and presented under a separate argument heading, showing the nature of the question to be presented and the point to be made, are part of the '"[o]bvious considerations of fairness"' to allow the respondent its opportunity to answer these arguments [citation] and also '"to lighten the labors of the appellate [courts] by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass"' [citation]." (*People v. Roscoe* (2008) 169 Cal.App.4th 829, 840.) Petitioner's opening brief fails to identify a challenge to County's findings of fact and statement of overriding conditions as an issue for review. Consequently, this issue is forfeited. (*Ibid.*)

In any event, petitioner has failed to demonstrate that County's findings of fact and statement of overriding considerations are legally deficient. "Override findings are sufficient if they 'demonstrate the balance struck' by an agency in 'weighing the benefits of the proposed project against its unavoidable adverse impacts.' [Citation.]

63.

Additionally, 'a statement of overriding considerations must be supported by substantial evidence contained in "the final EIR and/or other information in the record." (Guidelines, § 15093, subd. (b).)' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 983.)

Here, County identified seven benefits of the Project. County determined that "the benefits identified are each one in and of themselves sufficient to make a determination that the adverse project-level and cumulative environmental effects are acceptable." County stated that it "balanced the adverse environmental effects of the Project, which cannot otherwise be avoided or substantially lessened, against each of the benefits" and adopted the statement of overriding considerations "based upon each of the benefits individually." This demonstrates County balanced the benefits of the Project against its unavoidable impacts.

One of the benefits identified by County is that the Project would provide an additional local source of aggregate. This was based on the finding that there is a shortage of aggregate throughout the Fresno region. In our discussion of air quality above, we have concluded that this finding is supported by substantial evidence. Since the record shows County weighed the benefits of the Project against its unavoidable adverse impacts and substantial evidence supports at least one of the benefits identified as independently outweighing those impacts, County's findings of fact and statement of overriding considerations is sufficient.

## V.  *Findings required to approve CUP*[*]

Finally, petitioner contends there is no substantial evidence to support the required CUP findings. This contention is based in large part on petitioner's challenges to the adequacy of the EIR.

---

[*]  See footnote, *ante*, page 1.

64.

Under Fresno County Zoning Ordinance section 873, subdivision F (section 873-F), the planning commission must make four required findings before approving or recommending approval of a CUP. A planning commission staff report, dated August 9, 2012 (the August 2012 staff report), provided the staff's analysis in support of each of the four required findings.

As an initial matter, petitioner points out that the findings required for the CUP approval appear in the August 2012 staff report but are not included in the Board's resolution or its findings of fact and statement of overriding considerations. Section 873-F refers to required findings *by the planning commission*, not the Board. Respondents and real parties in interest argue that the planning commission's resolution "specifically referenced and incorporated" the August 2012 staff report. (Italics omitted.) We have reviewed the planning commission's resolution and do not find that it incorporated the August 2012 staff report by reference. The resolution expressly incorporated attached documents of (1) findings and a statement of overriding considerations and (2) mitigation measures and a mitigation monitoring plan. Regarding the August 2012 staff report, the resolution provided that the planning commission "independently reviewed and considered" it, but did not expressly provide that the August 2012 staff report was incorporated by reference.

Nevertheless, we reject petitioner's claim, which is based on an apparent technical violation of the zoning ordinance. Government Code section 65010, subdivision (b), of the Planning and Zoning Law (Gov. Code, § 65000 et seq.) requires a showing of prejudice in order to set aside an agency decision on the basis of procedural error. It provides:

> "No action … by any public agency … or any of its administrative agencies or officials on any matter subject to this title shall be held invalid or set aside by any court on the ground of the improper admission or rejection of evidence or by reason of any error, irregularity, informality, neglect, or omission (hereafter, error) as to any matter pertaining to

65.

petitions, applications, notices, findings, records, hearings, reports, recommendations, appeals, or any matters of procedure subject to this title, *unless the court finds that the error was prejudicial and that the party complaining or appealing suffered substantial injury from that error and that a different result would have been probable if the error had not occurred.* There shall be no presumption that error is prejudicial or that injury was done if the error is shown." (Gov. Code, § 65010, subd. (b), italics added.)

Government Code section 65010 "is a 'curative statute' enacted by the Legislature for the purpose of 'terminating recurrence of judicial decisions which had invalidated local zoning proceedings for technical procedural omissions. [Citations.]' [Citation.]" (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 921 (*Rialto*).)

Here, it appears there was an error: the omission of the required findings from the planning commission's resolution. The required findings, however, can be found in the August 2012 staff report, which the planning commission reviewed before passing the resolution. This suggests the omission "was an oversight and did not result in prejudice or substantial injury to anyone." (*Rialto*, *supra*, 208 Cal.App.4th at p. 923.) Petitioner does not offer any evidence or argument to show that a different result would have been probable if the error had not occurred. Accordingly, petitioner's claim of technical violation of section 873-F fails.

Petitioner's primary argument is that no substantial evidence supports the four findings required by the zoning ordinance. As described in the August 2012 staff report, the four required findings are:

> "1. That the site of the proposed use is adequate in size and shape to accommodate said use and all yards, spaces, walls, and fences, parking, loading, landscaping, and other features required by this Division, to adjust said use with land and uses in the neighborhood[.]

> "2. That the site for the proposed use relates to streets and highways adequate in width and pavement type to carry the quantity and kind of traffic generated by the proposed use.

"3. That the proposed use will have no adverse impact on abutting property and surrounding neighborhood or permitted use thereof.

"4. That the proposed use is consistent with the Fresno County General Plan."

With respect to the first finding—that the site is adequate to accommodate the proposed use and to adjust such use with land and uses in the neighborhood—petitioner argues the applicant failed to produce a site plan with enough specific information. Friends' attorney, Burch, raised this concern in her letter of August 3, 2012, described above in our discussion of nighttime operations. Applicant's attorney, Henry, responded that the reclamation plan at appendix B-1 of the DEIR provides a site plan. On appeal, petitioner argues that the reclamation plan was set aside by the SMGB and is insufficient evidence because it is missing an engineered grading and drainage plan. Petitioner does not explain why an engineered grading and drainage plan is necessary to understand whether the site is an adequate size and shape to accommodate the Project, however, and we have concluded that the reclamation plan was not set aside. The August 2012 staff report analysis of this finding notes that County Zoning Ordinance section 858 precludes extraction of material within 25 feet of any property line or within 50 feet of a road right-of-way, and the Project proposes to set back excavation a minimum of 100 feet from the property line. The August 2012 staff report finds that the property provides sufficient area to maintain the proposed setbacks and sufficient area for the access road and circulation of trucks within the processing plant. We will not disturb this finding based on petitioner's substantial-evidence challenge.

With respect to the second finding—that the streets and highways are adequate for the proposed use—petitioner asserts "County simply cannot make the finding." It claims the roadways are inadequate and County has not done the required studies to determine the level of increased safety risk caused by the Project. This argument is based on petitioner's challenge to the traffic analysis, discussed above in our consideration of revisions to the DEIR. Since we have rejected petitioner's claim that the traffic analysis

is inadequate, we also reject this argument. In its reply brief, petitioner suggests that the findings in the August 2012 staff report are inaccurate. In analyzing traffic impacts, the DEIR notes that, if planned improvements to a road are delayed or not constructed, the Project's impact could be significant, while the staff report does not include this observation. This does not demonstrate that the August 2012 staff report is inaccurate. Nor does it bolster petitioner's claim that no substantial evidence supports the second finding.

Petitioner asserts the third finding "is not possible," relying on the fact that the EIR determines that certain impacts would be significant and unavoidable. The August 2012 staff report explains, however, that an impact deemed significant and unavoidable for CEQA purposes would not necessarily be an adverse impact on neighbors for purposes of the third finding of section 873-F. The report explains, for example: "The EIR concluded that the Project's impacts related to odor would be significant and unavoidable because one residence is within the one mile of the proposed asphalt plant, which is a screening level criteria specified in APCD [air pollution control district] guidance. This was a legally conservative determination of the purposes of the County's CEQA review. However, based on the analysis above [describing EIR analysis and mitigation measures], staff recommends that for purposes of CUP Finding 3 the Commission can make the finding that impacts related to air quality would not adversely affect abutting properties and surrounding neighborhoods or the permitted use thereof." Petitioner does not argue that County may not interpret its zoning ordinance in this manner, and such an argument would not be successful. A local government agency is entitled to deference in the interpretation of its own local zoning ordinances. (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1130 (*Gray*).) In it reply brief, petitioner argues the third finding is not supported by substantial evidence because the EIR's analysis of groundwater impacts is inadequate, but we have rejected this argument.

As to the fourth finding—that the Project is consistent with County's general plan—petitioner makes no effort to describe County's general plan or explain how the Project would conflict with the general plan. Petitioner states the Project is inconsistent with the general plan because of the "serious impacts to agricultural values, air quality and oak savanna, among other things." This is insufficient. County's interpretation of its own general plan is entitled to considerable deference. (*Gray*, *supra*, 167 Cal.App.4th at p. 1129.) We also observe that County's general plan recognizes that aggregate and petroleum are County's most significant extractive resources and play an important role in maintaining County's overall economy. Petitioner has failed to establish that no reasonable person could have reached the conclusion that the Project is consistent with County's general plan. (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 243.)

For the foregoing reasons, we will not set aside the approval of the CUP based on petitioner's argument that County violated its own zoning ordinance.

## *DISPOSITION*

The judgment is affirmed. Costs on appeal are awarded to respondents and real parties in interest.

_____
Kane, J.

WE CONCUR:


_____
Gomes, Acting P. J.


_____
Franson, J.

69.